IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No.

JOHN HISLOP, individually and derivatively on behalf of
NATION ENERGY INC.,
DAVID N. SIEGEL, and
ROBERT TELLES, as Trustee of DAVID N. SIEGEL FAMILY
TRUST 2015,

        Plaintiffs,

v.

PALTAR PETROLEUM LIMITED, an Australian corporation,
MARC BRUNER,
MICHAEL CAETANO,
CARMEN LOTITO,
DARREL CAUSBROOK,
ROBERT BULJEVIC,
ROBERT MADZEJ,
BELINDA NISBET, and
DOES 1-20.

        Defendants.

---

## COMPLAINT AND JURY DEMAND

---

    Plaintiffs John R. Hislop ("Hislop"), David N. Siegel ("Siegel"), and Robert Telles as

Trustee of David N. Siegel Family Trust 2015 bring this Complaint against Paltar Petroleum

Limited, an Australian corporation, Marc Bruner, Michael Caetano, Carmen Lotito, Darrel

Causbrook, Robert Buljevic, Robert Madzej, Belinda Nisbet, and Does 1-20 state as follows:

### <u>SUMMARY OF THE CASE</u>

    1.    Plaintiffs bring this action to redress the massive fraud and racketeering, breaches

of fiduciary duties and other violations of their legal rights perpetrated by Defendants.

Defendants' wrongful conduct has resulted in the loss of valuable assets rightfully belonging to Nation Energy, Inc. ("Nation Energy").

2.      In 2012 and thereafter, Defendant Paltar Petroleum Limited ("Paltar") acquired an interest in a number of oil and gas exploration permits issued by the Northern Territory of Australia.  Paltar, however, did not have sufficient funds or the ability to raise funds for the exploration and development of these permits.

3.      In 2015, the principals of Paltar and Nation Energy reached a deal that Paltar would operate the exploration permits and Nation Energy would raise the funds needed to finance the exploration and development work.

4.      Part of the consideration for the deal was that Paltar would become the substantial majority shareholder in Nation Energy and Nation Energy's former majority shareholder, Plaintiff Hislop, would become a minority shareholder.   In September 2016, Nation Energy issued 900 million shares in Nation Energy to Paltar, giving Paltar approximately 85% ownership in Nation Energy.

5.      In exchange for Nation Energy's obligation to finance Paltar's operation of the Exploration Permits, Paltar agreed that Nation Energy (through a subsidiary) would earn the right to an interest in any production licenses issued to Paltar by the Northern Territory.   The interest that Nation Energy's subsidiary would earn varied by exploration permit.  With respect to EP 136 and EP 143, Nation Energy's subsidiary would earn all of Paltar's interest in any production licenses issued to Paltar and an overriding royalty of 75% to the petroleum revenue generated therefrom.   Paltar and its subsidiary entered into a series of earning agreements with Nation Energy's wholly-owned subsidiary Nation Energy (Australia) Pty Ltd. ("Nation

Australia"), one agreement for each exploration permit.  Nation Australia's rights to any future production licenses were contained in the earning agreements.

6.     When the parties entered into the various agreements, all parties understood that Nation Energy did not have the funds necessary to finance Paltar's operation.  In 2016 and thereafter, Nation Energy, through subsidiaries, raised millions from investors for that purpose and had retained a financial advisor, on a monthly retainer, to raise additional funds when the events that led to this lawsuit occurred, disrupting Nation Energy's fundraising efforts.

7.     At some point, but in any event no later than March 2017, Paltar's Chairman Marc Bruner ("Bruner") formulated a wrongful scheme to strip Nation Energy and Nation Australia of the earning agreements and defraud Nation Energy's minority shareholder and investors.  Unknown to Plaintiffs, Bruner and his co-conspirators planned to declare a fraudulent default by Nation Australia under the earnings agreements and cause Nation Australia to surrender its interests to Paltar.  If Paltar were free of its contractual relationship with Nation Australia, Paltar then could enter into a joint venture with another company Bruner controls, Fortem Resources, Inc. ("Fortem").  Because of their greater ownership interest in Paltar and Fortem, Bruner and his co-conspirators would personally gain financially, at the expense of Nation Energy and Nation Australia, from shifting the future petroleum licenses and royalty away from Nation Australia and its investors to Paltar and Fortem.

8.      Bruner and his co-conspirators concealed their scheme from Plaintiffs in order to induce them to continue financing Paltar and Nation Energy.  In furtherance of the conspiracy and racketeering, Bruner and his co-conspirators fraudulently induced Plaintiffs to loan their own

funds and authorize the use of funds raised from investors held in Meinster & Associates PC's COLTAF trust account to pay Paltar's and Nation Energy's creditors.

9.     From June 24, 2016 to April 27, 2017, the Nation Energy Board of Directors consisted of Plaintiff Hislop, Plaintiff Siegel and Darrel Causbrook ("Causbrook").  On April 27, 2017, in violation of his fiduciary duties and in furtherance of the conspiracy and racketeering, Bruner took control over the Nation Energy Board of Directors by executing, as Paltar's Chairman, a Majority Shareholder Action by Written Consent (the "Paltar Written Consent").  In the Paltar Written Consent, Bruner unilaterally increased the size of the Nation Energy Board from three directors to seven and appointed his co-conspirators to the newly created vacancies ("Bruner's Nation Energy Board").   Among other co-conspirators, Bruner appointed the Chairman and Chief Executive Officer of Fortem at the time, Michael Caetano ("Caetano"), and one of Paltar's officers, Carmen Lotito ("Lotito"), to the Nation Energy Board.

10.     Two weeks later, in violation of their fiduciary duties and in furtherance of the conspiracy and racketeering, Bruner's Nation Energy Board ousted Plaintiff Siegel as Chairman of the Board and Plaintiff Hislop as President and Chief Executive Officer.  Bruner's Nation Energy Board then installed Caetano at the helm of Nation Energy as Chairman of the Board, President and Chief Executive Officer.   Lotito was appointed Chief Operating Officer and Belinda Nisbet ("Nisbet") Secretary.

11.     Then, in June 2017, in violation of their fiduciary duties and in furtherance of the conspiracy and racketeering, Bruner's Nation Energy Board ousted Plaintiff Siegel, Plaintiff Hislop and Andrew Logan (Nation Australia's Chief Executive Officer at the time) from Nation Australia's Board.  Bruner's Nation Energy Board then installed Caetano, Caetano's friend and

business associate Robert Madzej ("Madzej") and Paltar director Darrel Causbrook ("Causbrook") on Nation Australia's Board. Caetano also became the Chair of Nation Australia's Board and Chief Executive Officer.

12. Once in control of the Nation Energy Board and the Nation Australia Board, in violation of their fiduciary duties and in furtherance of the conspiracy and racketeering, Bruner, Caetano, Lotito, Causbrook, Nisbet and others orchestrated a deal between Paltar, Fortem and Nation Energy. The deal was for (a) Paltar to issue a default notice to Nation Australia demanding the surrender of its interest in the earning agreements to Paltar, (b) Nation Australia to surrender its interests in the earning agreements to Paltar, and (c) Paltar to enter into a joint venture agreement with Fortem for the development of the exploration permits. The result would be the near total loss of Nation Australia and Nation Energy's interests in future petroleum revenues and the 50/50 sharing of future petroleum revenues between Paltar and Fortem.

13. No later than June 2017, Caetano hired Clark Wilson LLP, a Canadian law firm that had previously represented Nation Energy, to represent Fortem in the negotiations and drafting of the proposed Paltar and Fortem joint venture. At the time Caetano hired Clark Wilson to represent Fortem, Caetano was also Chairman of the Board, President and Chief Executive Officer of Nation Energy. The negotiations between Paltar and Fortem began at least 30 days before Paltar issued the fraudulent default notice to Nation Australia. At a minimum, Bruner, Caetano, Causbrook, Nisbet and Lotito participated in the negotiations between Paltar and Fortem that would grant Fortem rights in the very assets in which Nation Australia had the rights at the time.

14.     In furtherance of the racketeering and conspiracy, in June 2017, Caetano and Lotito seized control of Meinster & Associates PC's COLTAF trust account and wrongfully replaced Siegel as the authorized person to direct disbursements.  This was done over Siegel's objection and contrary to his written instructions to Barry Meinster, the principal of Meinster & Associates PC.

15.     In July 2017, after Paltar and Nation Energy prepared a settlement agreement and after Paltar and Fortem began documenting their joint venture as described above, in furtherance of the conspiracy and racketeering, Bruner caused Paltar and its subsidiary to declare a fraudulent "default" under the earning agreements.  Paltar and its subsidiary fraudulently claimed that Nation Australia had failed to contribute a portion of the expenses due under the earning agreements.  The expenses included millions of dollars of insider fees purportedly owed to Bruner's company Wotan, Causbrook's accountancy firm and Lotito.

16.     In August 2017, in violation of their fiduciary duties and in furtherance of the conspiracy and racketeering, Bruner's Nation Energy Board voted over the objections of Board members Hislop and Siegel to approve (1) the termination of the earning agreements, (2) the execution of a settlement agreement with Paltar, and (3) the surrender all of Nation Energy's and Nation Australia's rights to Paltar.  Bruner's co-conspirators had conflicts of interest because of their relationship with Bruner, Caetano, Paltar, and/or Fortem and their self-interest in the transaction with Fortem.  The Director Defendants and Nisbet concealed from Hislop and Siegel that they had been negotiating a deal between Paltar and Fortem and did not disclose their conflicts of interest before, during or after the Board meeting.

17.     In violation of their fiduciary duties and in furtherance of the conspiracy and racketeering, Caetano and Madzej then voted as directors of Nation Australia to approve the execution of a settlement agreement with Paltar and surrender and cancellation agreements of the earnings agreements.

18.     On or about August 9, 2017, in violation of his fiduciary duties and in furtherance of the conspiracy and racketeering, Caetano executed the settlement agreement on behalf of Nation Energy.  In violation of their fiduciary duties and in furtherance of the conspiracy and racketeering, Caetano and Madzej executed the settlement agreement and the surrender and cancellation agreements on behalf of Nation Australia.  In furtherance of the conspiracy and racketeering, David Sutton (a Paltar director), and Bruner executed the settlement agreement and the surrender and cancellation agreements on behalf of Paltar.

19.     Defendants' wrongful actions have caused serious, critical and irreparable harm to Nation Energy, its minority shareholder and other investors whose ownership/investment interest was rendered almost valueless by these actions.  Among other things, Plaintiffs seek (a) injunctive relief to protect Nation Energy and its innocent shareholders, and (b) monetary damages for losses suffered.  Defendants' wrongful actions have also harmed Plaintiffs by diminishing their voting power within Nation Energy and Nation Australia and by causing them other financial harm separate and apart from the harm to Nation Energy.

## PARTIES

20.     Plaintiff John R. Hislop ("Hislop") is a citizen of Canada residing in England and is a minority shareholder of Nation Energy.  Hislop had been Chief Executive Officer and

President of Nation Energy until Bruner's Nation Energy Board removed him.  Hislop has been and remains a member of Nation Energy's Board of Directors.

21.     Plaintiff David N. Siegel ("Siegel") is a United States citizen residing in Key Biscayne, Florida.  Siegel had been Chairman of Nation Energy until Bruner's Nation Energy Board removed him.  Siegel has been and remains a member of Nation Energy's Board of Directors.  He is an investor in Nation Energy through a subsidiary, Nation SLP, LLC ("Nation SLP"), a Delaware limited liability company.

22.     Plaintiff David N. Siegel Family Trust 2015 ("Siegel Family Trust") is a trust organized under the laws of the State of Colorado.  Robert Telles ("Telles") is the trustee of the Siegel Family Trust.

23.     Defendant Paltar Petroleum Limited is a corporation organized in Australia with its headquarters located at Level 10, 32 Martin Place, Sydney, New South Wales 2000.  Paltar is the majority shareholder of Nation Energy.  Paltar maintains an office located at 1555 Blake Street, Suite 1002, Denver, Colorado 80202 (the "Denver Apartment").  During the relevant period, the Denver Apartment has been used as Paltar's office, Nation Energy's office, Lotito's residence, and Bruner's residence when he is in Denver.

24.     Defendant Marc Bruner is a resident of Switzerland.  Bruner is Chairman of the Board of Paltar and the Chairman, President, Chief Executive Officer and a director of Fortem. He is a major shareholder of Fortem.  From September 15, 2015 to June 24, 2016, Bruner served as President and Chief Executive Officer of Nation Energy and a member of Nation Energy's Board.  Bruner travels regularly to Denver, Colorado for business and personal reasons.  During the relevant period, he has transacted Paltar business out of the Denver Apartment and has stayed

there when visiting Denver.  Bruner is one of two signatories on the lease for the Denver

Apartment.  Bruner listed his residence or business address as the Denver Apartment on a

Schedule 13D filed by Fortem with the U.S. Securities and Exchange Commission on or about

May 31, 2017.

25.     Defendant Michael Caetano is a resident of Canada.  As a result of the Paltar

Written Consent, Caetano is a member of Nation Energy's Board.  Caetano was appointed to the

positions of Chairman of the Board, Chief Executive Officer and President of Nation Energy

once Bruner's Nation Energy Board removed Plaintiffs from those positions.  Caetano is the

Chief Operating Officer and a director of Fortem and owns at least 13 percent of Fortem's

shares.  Prior to July 17, 2017, Caetano held the positions of Chairman and Chief Executive

Office of Fortem and stepped down from those positions to allow Bruner to fill them.  Caetano

travels frequently to Denver, Colorado and has transacted Nation Energy business in the State of

Colorado during the relevant period.

26.     Defendant Carmen Lotito is a resident of Denver, Colorado.  From July 22, 2015

to February 2017, he held the position of Vice President of Nation Energy.  As a result of the

Paltar Written Consent, Lotito is a member of Nation Energy's Board.  Bruner's Nation Energy

Board elected Lotito to the position of Chief Operating Officer.  Lotito has served as a consultant

to Paltar since June 2011, currently holds the position of Executive Vice President of Paltar and

is a shareholder in Paltar.  Lotito is a signatory to the lease for the Denver Apartment.  Lotito is

married to Bruner's ex-wife and is the step-father to Bruner's son.

27.     Defendant Darrel Causbrook is a resident of Australia.  Causbrook is a member of

the Board of Directors of Nation Energy and Paltar.

28.     Defendant Robert Buljevic ("Buljevic") is a resident of Canada.  As a result of the Paltar Written Consent, Buljevic is a member of the Board of Directors of Nation Energy. Buljevic and Caetano are friends.

29.     Defendant Robert Madzej is a resident of Canada.   As a result of the Paltar Written Consent, Madzej is a member of the Board of Directors of Nation Energy.  Madzej is a former Chief Operating Officer of Fortem.  Caetano and Madzej have a business relationship through a separate and unrelated entity called Green Matters, Inc.  Caetano is the Chief Executive Officer and Madzej is the Chief Operating Officer of Green Matters, Inc.

30.     Defendants Buljevic, Caetano, Causbrook, Lotito and Madzej are together referred to as the "Director Defendants."

31.     Defendant Belinda Nisbet is a resident of Australia.  At the May 11, 2017 meeting of the Bruner's Nation Energy Board, Nisbet was elected as Secretary of Nation Energy, replacing Hislop.  Nisbet also is a consultant to Paltar who assists Causbrook in his capacity as a Paltar director.

32.     Plaintiffs allege, on information and belief, that, at all times herein mentioned, each of the Defendants was the agent and/or co-conspirator of each of the remaining Defendants, and in doing the things hereinafter alleged, was acting within the scope of such agency and/or conspiracy, and with the permission and consent of the other co-Defendants.

33.     Plaintiffs allege, on information and belief, that Defendants sued as Does 1-20, inclusive, are U.S. and foreign entities and individuals who are now, or were earlier, participants in the conspiracy and racketeering.  Plaintiffs do not know the names and identities of Does 1-20 and therefore sue such defendants by their fictitious names.  Plaintiffs will promptly amend the

complaint to substitute the proper names and identities of these defendants as soon as this information is learned.

## JURISDICTION & VENUE

34.     This Court also has jurisdiction pursuant to 28 U.S.C. §1331 because the Racketeer Influenced and Corrupt Organizations Act claims alleged pursuant to 18 U.S.C. §§ 1961-1968, are claims arising under the laws of the United States.

35.     This Court also has supplemental jurisdiction over state law claims alleged in this complaint pursuant to 28 U.S.C. § 1367, because the Court has original jurisdiction over certain federal claims, and the state law claims are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution.

36.     A substantial part of the events and omissions giving rise to the claims occurred in the City and County of Denver. Therefore, venue is proper under 28 U.S.C. § 1391(b)(2) because the District of Colorado is the district and division embracing the City and County of Denver.

37.     This Court has personal jurisdiction over Defendants because they conduct systematic and continuous business activities in Colorado.   The Court also has personal jurisdiction over Defendants because the causes of action alleged herein arise out of or relate to Defendants' contacts with Colorado. Further, the Court has personal jurisdiction by virtue of 18 U.S.C. § 1965(b).

## GENERAL ALLEGATIONS

38.     Paltar operates as an oil and gas exploration business.  From 2012 and thereafter, Paltar acquired a number of exploration permits (EP 231, EP 232, EP 234 and EP 237) and a

50% interest in two more permits (EP 136 and EP 143) pursuant to which it has rights to explore and develop various properties in the Northern Territory of Australia.  Prior to its cancellation effective December 31, 2016, Paltar's wholly-owned subsidiary Officer Petroleum Pty Ltd. ("Officer") held an interest in Petroleum Exploration Permit 468 (Western Australia).  These seven exploration permits are referred to herein collectively as the "Exploration Permits."

39.     The other 50% interest in EP 136 and EP 143 are owned by a third party, Sweetpea Petroleum Pty Limited ("Sweetpea").   In September 2011, Paltar and Sweetpea associated themselves under a Joint Venture Operating Agreement as an unincorporated joint venture to conduct petroleum exploration on lands covered by EP 136 and EP 143.

40.     Under the Petroleum Act, Paltar may apply for a production license after discovering a commercially exploitable accumulation of petroleum.

41.     Paltar did not have, and could not raise, the funds needed to finance the work programs required under the Exploration Permits related to the future development and operation of the Exploration Permits.

### 2013 Agreements

42.     In or about August 2013, Bruner and Hislop began discussions about a potential transaction to raise funds for Paltar's development and operation of the exploration permits.

43.     At the time Bruner and Hislop had these discussions, Hislop owned nearly all of the outstanding shares in a Wyoming shell company called Nation Energy.  Bruner and Hislop agreed that Nation Energy would be the vehicle to hold and finance the exploration permits.

44.     Thus, on October 15, 2013, Nation Energy and Paltar entered into a letter agreement pursuant to which Paltar agreed to transfer and sell four exploration and development

permits and 29 applications for additional permits to Nation Energy in exchange for 600 million common shares of Nation Energy.

45.     The October 15, 2013 letter agreement is addressed to Marc Bruner, Paltar Petroleum Limited, 1555 Blake Street, Suite 1002, Denver, Colorado 80202.

46.     In connection with this letter agreement, Hislop loaned Paltar $300,000 and advanced a line of credit to Paltar for working capital.  Hislop and Paltar entered into a loan agreement dated October 11, 2013 (the "Hislop Loan Agreement").

47.     The governing law provision in paragraph 5.8 of the Hislop Loan Agreement states:  "This Loan Agreement is made in and shall be governed by and construed and interpreted in accordance with the laws of the State of Colorado."

48.     The notice provision in paragraph 4 of the Hislop Loan Agreement states that notices for Borrower (Paltar) should be sent to: "Paltar Petroleum Limited, 1555 Blake Street, Suite 1002, Denver, CO 80202 Attention: President."

49.     In connection with the loan, on October 11, 2013, Hislop entered into a Limited Non-Recourse Guaranty and Pledge Agreement with Wotan Group Limited ("Wotan"), the principal shareholder of Paltar (the "Pledge Agreement").  Wotan is a company owned and controlled by Bruner.

50.     The governing law provision in paragraph 11.5 of the Pledge Agreement states that the agreement "shall be governed by and construed and interpreted in accordance with the laws of the State of Colorado."

51.     The notice provision in paragraph 10 of the Pledge Agreement provides for notices to be sent to Wotan at the Denver Apartment with a copy to Wotan's attorneys located in Denver, Colorado.

52.     At Bruner's request, Hislop paid $669,418.67 to a Paltar creditor, CR Innovations AG on December 16, 2014.

53.     Hislop also lent Paltar amounts equivalent to $577,650 as (1) an advance under a line of credit and (2) purchase price for stock later orally agreed to be a loan.

54.     Although Hislop's loans to Paltar matured and became due, Paltar and Bruner lulled Hislop into not demanding payment in furtherance of the conspiracy and racketeering.

55.     Bruner, Paltar, Hislop and Nation Energy amended their letter agreement several times to, among other things, extend the time for Paltar to draw from the line of credit, add additional exploration properties, set new timetables for completion of the transaction contemplated by the letter agreement, and alter the structure of the asset purchase.

## 2015 Agreements

56.     In 2015, Siegel began negotiations with Bruner and Hislop to provide financing for the development and operation of the Exploration Permits.

57.     Pursuant to the terms of its joint venture with Sweetpea, Paltar was obligated to place AUD$800,000 in an escrow account by February 24, 2015, which was to remain in the escrow account until August 28, 2015.

58.     Siegel agreed to advance Paltar an amount up to AUD$800,000.  Paltar, Siegel and Meinster & Associates, P.C. ("Meinster & Associates") entered into an escrow agreement effective February 23, 2015.  Pursuant to the terms of the escrow agreement, Siegel wired

AUD$800,000 into Meinster & Associates's Chase account.   In consideration of Siegel providing the use of AUD$800,000, Paltar agreed that Siegel would receive a 5% limited partnership interest in a limited partnership to be formed by Nation Energy.

59.     Meinster & Associates is a law office located in Conifer, Colorado that has been counsel for Paltar and Bruner.  Barry Meinster is the principal of Meinster & Associates.

60.     In June and July 2015, Nation Energy formed a number of entities to enter into various agreements relating to the Exploration Permits.

61.     On June 19, 2015, Nation Energy formed Nation Australia.

62.     On July 6, 2015, Nation Energy registered a wholly-owned subsidiary in Delaware, Nation GP, LLP ("Nation GP"), a Delaware limited liability company.  Nation Energy currently owns 100% of the membership interests in Nation GP.

63.     On July 6, 2015, Nation Energy registered a wholly-owned subsidiary in Delaware, Nation SLP, a Delaware limited liability company.  Nation Energy is the managing member of Nation SLP.  Nation Energy currently owns  68.25% of the membership interests in Nation SLP.

64.     On July 8, 2015, Nation Energy formed Paltar Nation Limited Partnership ("Paltar Nation"), a Delaware limited partnership between Nation GP as the general partner of the partnership and Nation SLP as the limited partner (which is currently the sole limited partner of Paltar Nation).

65.     Nation Energy formed (1) Nation Australia to enter into earning agreements with Paltar and Officer, and (2) Paltar Nation and Nation SLP to raise equity capital to, among other

things, fund Paltar's operation of the Exploration Permits subject to the earning agreements between Paltar and Nation Australia.

66.     In August 2015, Siegel, Paltar and Meinster & Associates entered into a letter of understanding dated August 4, 2015.  The letter of understanding is in the form of a letter from Siegel with a Denver, Colorado address sent to Bruner at the Denver Apartment and to Meinster & Associates at an address in Conifer, Colorado.

67.     In their letter of understanding, Siegel agreed that the AUD$800,000 being held in escrow by Meinster & Associates would be transferred to Paltar Nation as the initial AUD$800,000 of the up to AUD$5,000,000 total bridge financing.

68.     On August 4, 2015, Paltar Nation entered into a secured convertible note purchase agreement with David N. Siegel Dynasty Trust, pursuant to which Paltar Nation issued a secured convertible promissory note in the principal amount of $584,000 in consideration for $584,000.

69.     The negotiations led to an agreement that Paltar would operate the Exploration Permits and Nation Energy would raise funds through subsidiaries to finance Paltar's operation in exchange for the right to any production licenses issued to Paltar and an overriding royalty in all petroleum production.

70.     The parties memorialized their deal in a series of agreements, including but not limited to, an amended and restated letter agreement, seven earning agreements and a promissory note.  Since Paltar was not able to transfer the Exploration Permits to Nation Energy without risking the loss of the Exploration Permits, the parties entered into earning agreements to accomplish the same purpose – transferring the value of the Exploration Permits to Nation Energy through its subsidiary.

71.     The letter agreement first entered into in 2013 was amended and restated by the Third Amended and Restated Agreement dated August 28, 2015 between Nation Energy, Hislop, Paltar and Bruner ("Third Amended and Restated Agreement").

72.     The Third Amended and Restated Agreement is in the form of a letter from Nation Energy addressed to Mr. Marc A. Bruner at Paltar Petroleum Limited, 1555 Blake Street, Suite 1002, Denver, Colorado 80202.

73.     Attorneys in the Denver office of Hogan Lovells US LLP ("Hogan Lovells") drafted the Third Amended and Restated Agreement.   Attorneys at Lohf, Shaiman, Jacobs, Hyman & Feiger PC ("Lohf Shaiman") in Denver, Colorado represented Paltar in connection with the negotiating, drafting and execution of the Third Amended and Restated Agreement.

74.     Pursuant to the terms of the Third Amended and Restated Agreement, on August 30, 2015, Paltar and Nation Australia entered into six separate earning agreements relating to EP 136, EP 143, EP 231, EP 232, EP 234 and EP 237 issued by the Northern Territory.

75.     Officer and Nation Australia entered into a separate earning agreement relating to EP 468, which covers land located in Western Australia's Officer Basin.

76.     The parties subsequently amended the original earning agreements by a master amendment dated December 17, 2015 and a second master amendment dated February 8, 2016 (the "Original Earning Agreements").

77.     The Original Earning Agreements were drafted by attorneys in the Denver office of Hogan Lovells.

78.     Paragraph 12 of the Third Amended and Restated Agreement provides that prior to the issuance of the shares to Paltar, Hislop will vote his shares of Nation common stock to

elect Hislop, Causbrook, Siegel, Bruner and one independent person that is also not an equity holder of Paltar as members of the Nation Board.

79. Pursuant to paragraph 12 of the Third Amended and Restated Agreement, on July 22, 2015, Hislop voted his shares in Nation Energy to appoint Bruner, Causbrook, Siegel and himself to the Nation Energy Board of Directors.

80. On September 15, 2015, Hislop resigned as Chairman of the Board and as President and Chief Executive Officer of Nation Energy. Siegel became Chairman of the Board and Bruner became President and Chief Executive Officer of Nation Energy.

81. The structure and terms of the parties' deal evolved over time. The Third Amended and Restated Agreement was subsequently amended by (a) the first amendment dated effective December 17, 2015 (the "First Amendment"), (b) the second amendment dated effective February 8, 2016 (the "Second Amendment"), (c) the third amendment dated effective May 31, 2016 (the "Third Amendment"), and (d) the fourth amendment dated May 31, 2016 (the "Fourth Amendment"). The Third Amended and Restated Agreement as amended is expressly governed by Wyoming law.

82. On May 31, 2016, Paltar and Nation Australia amended and restated the six original earning agreements relating to EP 136, EP 143, EP 231, EP 232 and EP 237. Officer and Nation Australia amended and restated the original earning agreement relating to EP 468. The seven earning agreements are collectively referred to as the "Earning Agreements."

83. The Earning Agreements were drafted by Paltar's Denver attorney David Ebner of Lohf Shaiman.

84.     In connection with the amending and restating of the Earning Agreements, Nation Australia issued an AUD$24.3 million promissory note (the "Note") to Paltar, with payment guaranteed by Nation Energy.   The face of the Note states "Dated: May 31, 2016   Denver, Colorado."   The Note states that the principal amount reflects the cash consideration due under all of the Earning Agreements.

85.     Paragraph 1 of the Note provides that "subject to prepayment as set forth in Section 2, all principal and any accrued but unpaid interest under this Note shall be due and payable on May 31, 2019."

86.     Paragraph 3 of the Note requires Nation Australia to make certain prepayments in the event Paltar Nation receives financing in 2016 of at least $80 million.

**Paltar Became Nation Energy's Majority Shareholder in September 2016**

87.     On June 24, 2016, Bruner resigned from the Nation Energy Board.   From the time of his resignation to April 27, 2017, the Nation Energy Board consisted of three directors: Hislop, Siegel and Causbrook.

88.     On September 29, 2016, Nation Energy issued 900 million shares in Nation Energy ("the Earning Agreement Shares") to Paltar pursuant to the Third Amended and Restated Agreement (as amended by the Fourth Amendment dated May 31, 2016).

89.     As a result of the issuance of the Earning Agreement Shares, Hislop, who had owned nearly 100 percent of Nation Energy, had his ownership therein reduced to an approximately 15 percent minority shareholder interest and Paltar became the 85% majority shareholder in Nation Energy.

90.     There are approximately 21 minority shareholders who hold a fractional interest in Nation Energy.

## Relevant Provisions of the Earning Agreements

91.     Section 3 of the Earning Agreements designated Paltar as Operator.   Section 5.3(b) of the Earning Agreements (Section 5.2(b) in some of the Earning Agreements) obligated Nation Australia to pay Paltar for "Work Program Expenses and Budget Costs actually incurred for the third Permit Year" and "Work Program and Budget costs estimated for the fourth Permit Year" "as soon as practicable after Nation Australia has such funds conveniently available." Starting with the fifth Permit Year, Nation Australia was obligated to deliver funds in accordance with the procedures and schedules set forth in the Earning Agreements.

92.     Section 5.3(b) reflected the parties' understanding that Nation Australia would not, and could not, reimburse Paltar for the past expenses Paltar had incurred until Nation Energy (through its subsidiaries) had raised financing.

93.     The Earning Agreements define "Work Program and Budget" as "an annual work program prepared by Paltar setting out the Operations to be undertaken during that year under this Agreement in respect of the Permit, together with the estimated amounts required to perform such work program."

94.     The Earning Agreements define "Work Program Expenses" as "the costs and expenses incurred, paid or payable by the Operator in accordance with the provisions of this Agreement or otherwise authorized by the Operating Committee in connection with conducting Work Programs and Budgets."

95.     Section 6.2(a) of the Earning Agreements for EP 136 and EP 143 obligated Paltar to transfer its entire interest in any production license for a Paltar Block (as defined in the Earning Agreements) issued to Paltar by the Northern Territory to Nation Australia with a 75% overriding royalty interest with respect to all petroleum produced from each Paltar Block covered by the production license.

96.     The Earning Agreements for EP 231, EP 232, EP 234 and EP 237 were set up slightly differently from the Earning Agreements for EP 136 and EP 143.   Under Sections 3.1 and 6.2(a) of the Earning Agreements for EP 231, EP 232, EP 234 and EP 237, Nation Australia would earn an undivided 25% interest in the permits and any production license granted to Paltar by the Northern Territory once it had spent a certain amount of money.

97.     Section 7.1 of the Earning Agreements provides that "Nation will be in default under this Agreement if it fails to contribute any portion of the Work Program Expenses when due under clause 5.3(b)" (emphasis added).

**Fracking Moratorium Imposed in Australia**

98.     Starting in about November 2015, Paltar conducted limited activities in relation to the Exploration Permits due to a potential fracking moratorium/ban in the Northern Territory. Paltar represented to the Northern Territory that it had completed work required for Permit Years 1, 2 and 3.

99.     In September 2016, the Northern Territory Government imposed a moratorium on hydraulic fracturing of unconventional reservoirs.

100.    Paltar applied for suspensions and extensions of EP 136, EP 143, EP 231, EP 234 and EP 237 because of the moratorium.   In its applications, Paltar represented that it has

complied with the work program commitments for Years 1, 2 and 3. The Northern Territory Government approved a 12 month suspension and a 12 month extension and variation to the work program conditions. As a result, the permit years have been extended under the Earning Agreements such that the fourth Permit Year was scheduled to end on August 27, 2017.

101.    Upon information and belief, Paltar has applied for an additional suspension and extension of EP 136, EP 143, EP 231, EP 234 and EP 237 so that the fourth Permit Year would not have ended on August 27, 2017, but rather on August 27, 2018.

### Fundraising Efforts

102.    Throughout 2016 and 2017, Nation SLP conducted an unregistered offering of its membership interests for a maximum capital raise of $5 million.

103.    Nation SLP sold, in exchange for cash and/or promissory notes, limited liability company membership interests (the "LLC interests"), comprising over the course of the offering 9.25% of the total membership interest of Nation SLP, for a total amount of $5 million.

104.    The sale of the LLC interests occurred over multiple closings during 2016 and 2017.

105.    As of December 31, 2016, Nation SLP had sold LLC interests totaling 2.59% of Nation SLP membership for an aggregate price of $1.4 million.

106.    From January 1, 2017 through March 30, 2017, Nation SLP completed additional sales of the LLC interests totaling 4.995% of Nation SLP membership for an aggregate price of $2.7 million.

107. On March 31, 2017, Nation SLP sold additional LLC interests totaling 1.665% of Nation SLP membership for an aggregate price of $900,000, in the form of three $300,000 promissory notes delivered in favor of Nation SLP.

108. Nation Energy also engaged MuellerChen Co., LLC, an independent energy investment bank, as its placement agent for financing of Paltar Nation. The goal was to raise another $5 million to be followed by an approximately $20 million. Nation Energy's fundraising efforts were disrupted by Bruner's takeover of Nation Energy's board.

**Paltar Fraudulently Induced Plaintiffs and Other Investors to Make Loans and Payments For Its Benefit And Nation Energy's Benefit**

109. Over the course of approximately two years, Paltar, through its officers and directors, including Bruner, Causbrook and Lotito, repeatedly represented to Plaintiffs and others that Paltar needed funds.

110. In interstate and international email communications, Paltar and its co-conspirators concealed their plan from Plaintiffs to strip the earning agreements from Nation Australia and to violate the parties' agreements. Plaintiffs did not know that Paltar intended to strip the earnings agreements from Nation Australia and enter into a joint venture with Fortem instead.

111. Paltar concealed these material facts that in equity and good conscience should have been disclosed in order to induce Plaintiffs to (a) continue to fund Paltar's operation of the Exploration Permits, (b) loan Paltar money, and (c) pay for Nation Energy's expenses. As part of the conspiracy and racketeering, interstate and international emails were sent from Causbrook, Lotito and others to Plaintiffs requesting payment of various invoices and expenses incurred by Paltar and Nation Energy.

112.    Had Plaintiffs known of Defendants' wrongful scheme, they would not have loaned money or made payments to Paltar's and Nation Energy's creditors.

113.    Meinster & Associates holds a COLTAF trust account into which Siegel and other investors in Nation SLP wired money in 2016 and 2017 for use for working capital and to facilitate the financing of Nation Australia's obligations under the Earning Agreements. Pursuant to Meinster's agreement with Siegel, Meinster could only disburse funds from Meinster & Associates's COLTAF trust account with Siegel's prior written authorization.  Siegel had the sole and irrevocable authority to direct disbursement of the funds held in Meinster's COLTAF trust account.

114.    On August 26, 2015, the Siegel Family Trust loaned Paltar AUD$214,000. Bruner, on behalf of Paltar, executed a promissory note evidencing the loan.

115.    On August 26, 2015, Hislop loaned Paltar AUD$214,000.  Bruner, on behalf of Paltar, executed a promissory note evidencing the loan.  The purpose of the loan from Hislop and Siegel was for Paltar to be able to pay Australian taxes relating to Exploration Permit 468.

116.    The Siegel Family Trust loaned Paltar Nation $584,000.  The secured convertible promissory note evidencing this loan is dated October 14, 2015 with an effective date of August 4, 2015.  The note states "Denver, Colorado" on its face.

117.    On October 10, 2015, the Siegel Family Trust wired $6,000 to Paltar's bank account in Sydney, Australia.

118.    On March 30, 2016, the Siegel Family Trust wired $85,000 to Paltar's bank account in Sydney, Australia so Paltar could pay outstanding amounts due to AECOM Australia LTD.

119.    On May 3, 2016, the Siegel Family Trust wired $34,000 to Paltar's bank account in Sydney, Australia so Paltar could pay outstanding amounts due to Deloitte.

120.    Beetaloo Basin Partners I, LLC loaned Paltar $75,000 on approximately November 7, 2016 and another $75,000 concurrent with the execution of a secured promissory note dated March 13, 2017 in the aggregate principal amount of $150,000.

121.    Beetaloo Basin Partners II, LLC loaned Paltar $75,000 on approximately November 7, 2016 and another $75,000 concurrent with the execution of a secured promissory note dated March 13, 2017 in the aggregate principal amount of $150,000.

122.    On November 11, 2016, the Siegel Family Trust wired AUD$130,000 directly to Norton Rose, a law firm, on behalf of Paltar.

123.    On December 1, 2016, the Siegel Family Trust wired AUD$17,000 directly to Dentons, a law firm, on behalf of Paltar.

124.    On March 10, 2017, the Siegel Family Trust wired AUD$200,000 directly to Norton Rose, a law firm, on behalf of Paltar.

125.    Throughout 2016 and 2017, unaware of the wrongful scheme being concealed by Bruner and his co-conspirators, Siegel authorized other payments for Paltar's and Nation Energy's expenses to be made from Meinster & Associates's COLTAF trust account, including a $30,000 payment in March 2017 to Steptoe & Johnson PLLC.  Had Siegel known of the wrongful scheme, he would not have authorized payments for Paltar's and Nation Energy's expenses to be made.

**Bruner's Vulture Proposal**

126.    On February 22, 2017, Lotito sent Siegel an email proposing that Nation Energy agree to a new strategy for the development of EP 136 and EP 143 with Strongbow Resources (now known as Fortem), a company that is controlled by Bruner and Caetano.

127.    Siegel then met with Bruner and Caetano on March 14, 2017 in Provo, Utah. Bruner and Cateano proposed that Nation Energy's interest in the Earning Agreements relating to EP 136 and EP 143 be transferred to Strongbow Resources.

128.    Bruner's proposed transaction would have significantly increased his and Caetano's personal ownership interest in the project because of their greater ownership percentage of Strongbow.  It also would have substantially reduced Nation Energy's interest therein.

129.    Siegel rejected Bruner's proposal, which he believed posed a significant conflict of interest for Bruner and would cause serious harm to Nation Energy and its minority shareholder and investors.

130.    Not long after Siegel rejected his proposal, Bruner took a series of wrongful and oppressive actions that led to takeover of Nation Energy and the stripping away of the Earning Agreements.

131.    Bruner did not claim at this time that Nation Australia was in default under the Earnings Agreements.  It was only after Siegel had rejected Bruner's proposal that Paltar then fraudulently claimed, without basis and in furtherance of the conspiracy and racketeering, that Nation Australia was in default as described below.

**Siegel Is Fraudulently Induced To Pay Steptoe & Johnson PLLC**

132.    Throughout 2016 and 2017, Nation Energy used the Denver office of Steptoe & Johnson PLLC for various corporate work, including preparing the 2016 amendments to the deal agreements.  The attorneys principally responsible for handling Nation Energy's work have been John Chadd and Ghislaine Bruner.  Ms. Bruner is married to Bruner's son.  Thus, her father-in-law is Bruner and her step-father-in-law is Lotito.

133.    Unknown to Siegel and Hislop at the time (who were respectively Chairman and Chief Executive Officer and President of Nation Energy as well as directors), Steptoe & Johnson provided advice to Lotito regarding the ability of shareholders of Nation Energy to increase the size of the board and elect new directors.  John Chadd of Steptoe & Johnson sent emails to Lotito on which Ms. Bruner is copied on this topic on April 16 and 18, 2017.

134.    On April 18, 2017 and again on April 19, 2017, Ms. Bruner demanded payment of outstanding invoices in international emails sent to Siegel, Lotito, Telles and another person who handled the accounting for Nation Energy.  Although both Lotito and Ms. Bruner were aware of Paltar's imminent takeover of the Nation Energy Board, they both concealed this material fact from Siegel in order to induce him to authorize him to pay a significant part of the outstanding bill due to Steptoe & Johnson PLLC.

135.    On April 26, 2017, Siegel directed Meinster to wire $70,000 to Steptoe & Johnson PLLC as payment for charges incurred by Nation Energy.  Meinster sent an interstate and international email confirming that he would take care of the wire.  The very next day, Bruner took over the Nation Energy Board.

136.    Had Siegel been aware of Bruner and his co-conspirators' wrongful scheme, and Steptoe & Johnson PLLC's role in that scheme, he would not have authorized the payment to Steptoe & Johnson PLLC.

**Bruner Stacked The Nation Energy Board With His Co-Conspirators**

137.    On April 27, 2017, Bruner acted by Majority Shareholder Written Consent without any notice to increase the size of the Nation Energy Board from three directors to seven.

138.    In violation of his fiduciary duties, and in furtherance of the conspiracy and racketeering, Bruner appointed his co-conspirators to the four newly created positions so that they could carry out his wrongful plan to strip Nation Energy and Nation Australia of its assets: Caetano, Lotito, Robert Buljevic ("Buljevic"), and Madzej (collectively, "Bruner's Nation Energy Board").

139.    The newly appointed directors have familial, financial and/or business relationships with Bruner, Caetano, Paltar and/or Fortem and are participants in the conspiracy and racketeering.

140.    Bruner alone signed the Paltar Written Consent as Chairman of Paltar.

141.    Paltar's secretary Nick Tropea ("Tropea") transmitted the Paltar Written Consent to Hislop by international email after it had been executed.

142.    By violating its fiduciary duties, Paltar wrongfully obtained control over the Nation Energy Board to further the conspiracy and racketeering.

143.    On May 5, 2017, Hislop and Siegel sent Bruner a letter in which they objected to the Paltar Written Consent.

**Bruner's Nation Energy Board of Directors Ousted Siegel and Hislop
From Nation Energy's Leadership**

144.    On May 11, 2017, a meeting of Bruner's Nation Energy Board was held via telephonic conference.  Defendants Causbrook, Caetano, Lotito, Buljevic, Madzej and Nisbet were present.

145.    At the meeting, in furtherance of the conspiracy and racketeering, the Director Defendants elected Caetano to the positions of Chairman of the Board, Chief Executive Officer and President.  Hislop was replaced as Chief Executive Officer and President.  Siegel was replaced as Chairman of the Board.

146.    Also at the meeting, Caetano proposed a resolution to re-engage Steptoe & Johnson PLLC as the Company's outside legal counsel.  Lotito seconded the motion and the Director Defendants approved the motion.  Attorneys Ghislaine Bruner and John Chadd of Steptoe & Johnson PLLC's Denver office then joined the meeting by telephone.

147.    Also at the meeting, Caetano nominated Lotito for the position of Chief Operating Officer of Nation Energy.  Madzej seconded the nomination.  The Defendant Directors voted to elect Lotito as Chief Operating Officer.  Lotito then nominated Nisbet for the position of Secretary.  Causbrook seconded Nisbet's nomination.  The Defendant Directors voted to elect Nisbet as Secretary.

148.    On or about May 15, 2017, Hislop and Telles met with Bruner and Lotito at the Denver Apartment and demanded that Bruner undo the Paltar Written Consent and his other wrongful actions.  They were unable to reach any agreement with Bruner.

149.    On May 17, 2017, Siegel provided written instructions to Meinster to freeze all monies in the Meinster & Associates COLTAF trust account until further written notice from Siegel.

150.    Hislop, Siegel and Telles had several meetings in May and June with other shareholders and directors of Paltar to object to the wrongful and improper actions taken by Bruner and seek a resolution that would avoid embroiling the business in expensive and distracting litigation.

**Paltar and Fortem Negotiated A Deal In Secret**

151.    Unknown to Plaintiffs at the time, on June 2, 2017, Nisbet sent an international email to Paltar's attorney in Australia, copying others unknown at this time, forwarding draft transaction documents.

152.    Unknown to Plaintiffs at the time, on June 5, 2017, Paltar's attorney sent an international email to Lotito, Causbrook, Bruner and Nisbet discussing a conference call with respect to advice sought by Lotito.

153.    Unknown to Plaintiffs at the time, on June 13, 2017, Lotito sent an interstate and international email to Paltar's attorney in Australia to arrange a conference call with Bruner, Caetano, Causbrook and Nisbet to discuss the Fortem term sheet.

154.    Unknown to Plaintiffs at the time but known to Bruner, Lotito, Causbrook, Caetano and Nisbet, by June 19, 2017, a settlement agreement between Nation Energy, Nation Australia and Paltar was already being prepared.

**Bruner's Nation Energy Board of Directors Stacked The Nation Australia Board**

155.    In order to be able to finalize the deal between Paltar and Fortem, Bruner and his co-conspirators needed to oust Hislop, Siegel and Nation Australia's Chief Executive Officer Andrew Logan from Nation Australia's board.

156.    On June 19, 2017, a special meeting of Bruner's Nation Energy Board was held via telephonic conference with participants located in multiple different states and nations. Present at the meeting were directors Causbrook, Caetano, Lotito, Buljevic and Madzej and Secretary Nisbet.  Hislop and Siegel were absent.  Attorneys Ghislaine Bruner and John Chadd of Steptoe & Johnson PLLC's Denver office also attended the meeting.

157.    At the June 19, 2017 meeting, in furtherance of the conspiracy and racketeering, Bruner's Nation Energy Board voted to (1) waive the requirement for the giving of any notice of the special general meeting; (2) remove Andrew Logan, Siegel, Hislop and Causbrook as directors of Nation Australia; (3) appoint Causbrook, Madzej and Caetano to the Nation Australia Board; and (4) appoint Caetano as the Chair of the Nation Australia Board and Chief Executive Officer.

158.    Because of this wrongful vote by Bruner's Nation Energy Board at the June 19, 2017 meeting, Bruner and his co-conspirators effectively controlled the Nation Australia Board.

159.    Following the June 19 meeting, Hislop and Telles traveled to Australia to seek to convince Bruner and the major shareholders of Paltar to undo the wrongful and improper actions.

**Caetano and Lotito Seized Meinster & Associates's COLTAF Trust Account**

160.     On June 25, 2017, Siegel requested an accounting of the Meinster & Associates's COLTAF trust account from Meinster and further instructed Meinster to transfer the outstanding balance in the Meinster & Associates's COLTAF trust account to another law firm.

161.     On June 29, 2017, John Chadd of Steptoe & Johnson PLLC sent an interstate and international email to Siegel, Telles, Meinster, Lotito and Caetano in which he informed Siegel and Telles that Nation Energy had changed the authorizing party for disbursements from Meinster & Associates's COLTAF trust account to Caetano and Lotito.   This was done over Siegel's objection and contrary to his prior written instructions to Meinster.   Meinster & Associates's COLTAF trust account held approximately $235,000 at the time it was improperly seized by Caetano and Lotito, with the assistance of Steptoe & Johnson PLLC, in furtherance of the conspiracy and racketeering.

162.     As of the date of this complaint, Meinster has not provided the accounting of the COLTAF account requested by Siegel.   Siegel has filed a formal complaint against Meinster with the Colorado State Bar.

**Negotiations Between Paltar and Fortem Continued In Secret**

163.     In connection with proceedings in Australia (described below), Paltar produced a number of highly incriminating interstate and international emails from June 1, 2017 to the date of the subpoena September 12, 2017.   Some of these emails are described above in paragraphs 151-153 above.   The emails reveal that Paltar and Fortem began negotiating the terms of a joint venture between Paltar and Fortem relating to the Exploration Permits long before Paltar issued the fraudulent notice of default to Nation Australia.   The emails show that the default notice was

a sham and an independent and premediated part of the larger scheme to strip the Earning Agreements from Nation Australia.

164.    On June 30, 2017, Lotito, on behalf of Paltar, sent an email to Paltar's attorney in Australia and Fortem's attorney in Canada to introduce them to each other and inform them that Fortem's attorney would be "preparing an initial Draft of the Paltar/Fortem Agreement."  Lotito copied Caetano at his Fortem email address, Causbrook and Tropea.  Causbrook forwarded the email to Nisbet.

165.    On July 3, 2017, Lotito sent an email to Causbrook and Nisbet, copying Caetano at his Fortem email and Paltar's attorney in Australia, saying that "Nation Energy Inc., Nation Energy Australia, Paltar and Fortem need to finalize the … (1) Paltar Default Notice, (2) Settlement Agreement and (3) The Fortem /Paltar Private Placement."

166.    On July 7, 2017 (three days before the default notice was issued to Nation Australia), Fortem's attorney in Canada sent an email to Paltar's attorney in Australia, copying Caetano, Lotito and others, in which he summarized the proposed transaction between Paltar and Fortem, including "entry into a Joint Venture Agreement, whereby Fortem and Paltar agree to advance and develop Paltar's existing O&G assets on a 50/50 basis."

167.    On this same day, July 7, 2017, Nisbet sent an email to Causbrook forwarding an email from Paltar's attorney in Australia that attached drafts of the Settlement Agreement and Surrender Agreement (both defined below).  Nisbet frequently communicated with Paltar's attorney by email regarding the draft agreements.

**Paltar Issued A Fraudulent Default Notice To Nation Australia**

168.    Once the co-conspirators had together finalized the "default" notice, on July 10, 2017, in furtherance of the conspiracy and racketeering, Bruner caused Paltar and its subsidiary to issue a fraudulent notice of default to Nation Australia under the Earning Agreements, claiming that Nation Australia failed to contribute a portion of the Work Program Expenses due under Clause 5.3(b).

169.    Paltar claimed that Total Work Program Expenses related to EP 136, EP 143, EP 231, EP 232, EP 234 and EP 237 of USD\$5,195,327 were due and payable on or about April 15, 2017.  The claimed "default" included millions in insider fees purportedly owed to Bruner's company Wotan, Causbrook's accountancy firm and Lotito.  It also included amounts that Siegel, the Siegel Family Trust or others had previously paid.

170.    Under Section 7.3 of the Earning Agreements, Nation Australia had 30 days to remedy the default.

171.    In the notice of default, Paltar demanded that Nation Australia execute a written surrender instrument that would result in Nation Australia having no right to the interest in the Earning Agreements.

172.    The notice of default issued by Paltar to Nation Australia is fraudulent, contrived and without justification.  The notice of default was transmitted by an interstate or international email communication.

173.    Just four days after receiving the purported notice of default, on July 14, 2017, Caetano, as purported Chairman and CEO of Nation Energy, sent an international email in which he claimed to have verified the amounts claimed in the notice of default to be due as correct.

174.   Caetano informed the other Board members that it would be an item of discussion at the next meeting, without disclosing and concealing the fact that he, Lotito, Causbrook and Nisbet had known of the default notice before it was issued, helped prepare it and had already finalized the deal surrendering the Earnings Agreements with Paltar in order to allow Paltar and Fortem to enter into a joint venture agreement.

175.   Unaware of the conspiracy, Siegel and other investors challenged the Paltar notice of default as improper and invalid under the Earning Agreements since (a) no money is due until Nation has the money conveniently available under Section 5.3 of the Earning Agreements and (b) Paltar had not actually spent any money on Work Program Expenses (as defined in the Earning Agreements).   They communicated their objections to Caetano in writing and attempted to meet with Bruner again.   Their objections were ignored.

**Bruner's Nation Energy Board Approved The Surrender Of The Earning Agreements**

176.   Nation Energy's Board was initially scheduled to meet within days of receiving the Paltar notice of default but the meeting was re-scheduled several times.

177.   On August 1, 2017, Nisbet sent an international email to the Board members notifying them of a Board meeting scheduled for August 4, 2017.

178.   On August 3, 2017, the day before the scheduled meeting, Nisbet sent an international email transmitting an agenda and copies of the proposed Settlement Agreement and Surrender Agreement.   She did not disclose in her email or at any other time that at a minimum, she, Caetano, Causbrook and Lotito had been secretly finalizing the deal surrendering the Earnings Agreements with Paltar in order to allow Paltar and Fortem to enter into a joint venture agreement.

179.    The meeting was held telephonically on August 4, 2017, shortly before the expiration of the 30 day cure period.   A number of the attendees participated in the board meeting from the Denver office of Hogan Lovells, including Lotito, Denny Migl (an engineering manager at SIGMA Integrated Reservoir Solutions, Inc.), several attorneys from Hogan Lovells and an attorney from Steptoe & Johnson PLLC.   Other participants were located in Canada, Australia and other places around the world.

180.    At the August 4, 2017 meeting of Bruner's Nation Energy Board, Plaintiff Siegel expressed his concerns and objections to the meeting as improper since four of the directors had not been duly appointed by Paltar.   Siegel also objected to the proposal to simply concede that a default had occurred, pointing out, among other things, that (a) this was a very important issue that deserved serious consideration and deliberation since the vote would effectively surrender all of Nation Energy's assets to Paltar; (b) there appeared to be conflicts of interest that needed to be addressed; (c) the Board should first obtain a formal written legal opinion on this matter before making such an important decision; (d) it appeared to him there were substantial defenses available to Nation Energy that should be fully explored before simply conceding the defaults; and (e) the cure period had not even expired so there was no need nor basis to rush a decision on this issue.   Bruner's Nation Energy Board disregarded and rejected Siegel's concerns, not even allowing him to finish speaking.

181.    Bruner's Nation Energy Board held two votes.   The first vote was for the directors who did not own Paltar shares.   Causbrook, Lotito, Siegel and Hislop were excluded from the first vote.   The second vote was for all directors, including those who own Paltar shares.   None of the Director Defendants disclosed any other conflicts of interest.

182.    Each of the Director Defendants, however, lacked objectivity and has conflicts of interest from his familial, financial and/or business relationship with Bruner, Caetano, Paltar and/or Fortem and his participation in the conspiracy and racketeering.   Bruner, Paltar, Causbrook, Lotito, Caetano, and Fortem have a material financial interest in terminating the Earning Agreements with Nation Australia.

183.    In furtherance of the conspiracy and racketeering, Causbrook and each of the newly added Board members voted to concede the default, and to approve the execution of the proposed settlement agreement and surrender and cancellation agreements.   Hislop and Siegel voted against the proposal.

184.    Had Bruner not stacked the Nation Energy Board with his co-conspirators in April, the no votes would have prevailed since the Nation Energy Board previously consisted of Hislop, Causbrook and Siegel.   But in light of the current purported Board membership, Bruner's Nation Energy Board agreed to approve the surrender of the Earning Agreements to Paltar.

185.    The actions taken by the Board on August 4, 2017 constitute a breach of the Director Defendants' fiduciary duties.

186.    Bruner's Nation Energy Board approved the execution of Surrender and Cancellation Agreements between Nation Australia and Paltar (the "Surrender Agreement").   In the Surrender Agreements, Nation Australia agreed to surrender and terminate its interest in the Earning Agreements and Paltar cancelled the Earning Agreements.   The Surrender Agreements expressly provide that the termination of the Earning Agreements does not eliminate Nation Australia's obligation to pay the Note.

187.   Bruner's Nation Energy Board also approved the execution of a Settlement Agreement and Release of All Claims by and among Nation Energy, Nation Australia, Paltar and Paltar's wholly-owned subsidiary Officer Petroleum Ltd. (the "Settlement Agreement").   The Settlement Agreement included, among other things, a debt-for-equity exchange.   Paltar agreed to accept 627,833,445 newly-issued shares of common stock of Nation Energy in exchange for cancellation of purported debts and the Note.   In addition, Paltar granted Nation Energy a 5% overriding royalty in certain production in exchange for the issuance of an additional 500,000,000 shares of common stock of Nation Energy.   The Settlement Agreement also provides for the termination of the Third Amended and Restated Agreement.

188.   The Settlement Agreement lists the address of Nation Energy as the Denver Apartment.

189.   The issuance of an additional more than 1.1 billion shares to Paltar significantly and unfairly dilutes Plaintiff Hislop's interest in Nation Energy and effectively grants the 5% overriding royalty back to Paltar.

**Nation Australia's Board Approved The Surrender And Cancellation
Of The Earning Agreements**

190.   Following the August 4, 2017 Nation Energy Board meeting, in furtherance of the conspiracy and racketeering, the directors of Nation Australia, Caetano and Madzej, passed resolutions approving (a) the surrender of the Earning Agreements; (b) the execution of the Settlement Agreement; and (c) the execution of the Surrender Agreement.

191.   Had Bruner's Nation Energy Board not wrongfully and improperly removed Logan, Hislop and Siegel from Nation Australia's board on May 11, 2017 and thereby deprived

them of their voting power, Logan, Hislop and Siegel would have been able to block the surrender of the Earning Agreements to Paltar.

192.     Causbrook abstained from voting on the resolutions due to his conflict of interest but Caetano and Madzej did not disclose their conflicts of interest and voted to pass the resolutions approving the execution and delivery of the Settlement Agreement and Surrender Agreement.  Both Caetano and Madzej are conflicted due to their relationship with Fortem and their participation in the conspiracy.

193.     On or about August 9, 2017, Caetano and Madzej executed the Settlement Agreement and two Surrender Agreements on behalf of Nation Australia.  David Sutton, a Paltar director, and Bruner executed the Settlement Agreement and two Surrender Agreements on behalf of Paltar.  Caetano executed the Settlement Agreement on behalf of Nation Energy.

**Plaintiffs Have Obtained Injunctive Relief In Australia**

194.     Defendants' wrongful actions have required Plaintiffs Hislop and Siegel to engage Australian counsel to take immediate legal action to prevent Paltar from taking action in Australia that would prejudice their rights.

195.     On August 11, 2017, the Australian Court issued a temporary injunction preventing Paltar, Madzej, Caetano and Causbrook from taking or participating in any action to (1) enforce any of the Surrender Agreements or the Settlement Agreement, and (2) exploit the Earning Agreements by granting any right, title or interest in any of the Earning Agreements to any other person. The injunction has been extended until the Australian Court rules on whether Hislop is granted leave to bring proceedings in Australia in the name of Nation Australia at which time the injunction may be extended or possibly dissolved.

196.   On September 17, 2017, Caetano provided testimony in the proceeding in Australia by video link from the Denver office of Hogan Lovells.

197.   In order to obtain injunctive relief in an Australian court, Plaintiffs Hislop and Siegel have been forced to engage in an expensive litigation process.

198.   Defendants' wrongful conduct has caused and continues to cause irreparable injury to Plaintiffs and Nation Energy, including, but not limited to, the potential expiration of the injunction in Australia, the impairment of Plaintiffs' ability to raise capital for the benefit of Nation Energy and the diminution of the voting power of Hislop and Siegel on the boards of Nation Energy and Nation Australia.

<strong>Demand Allegations</strong>

199.   Plaintiff Hislop brings this action derivatively in the right of and for the benefit of Nation Energy to redress injuries suffered and to be suffered by Nation Energy as a result of the breaches of fiduciary duties by Paltar and the Director Defendants.  Plaintiff Hislop and his counsel will fairly and adequately represent the interests of Nation Energy in enforcing and prosecuting its rights.

200.   Based upon Paltar's and the Director Defendants' acts and omissions in direct violation of their fiduciary duties of care, good faith, honesty and loyalty, a pre-suit demand on the Nation Energy Board to bring the claims asserted in this action is excused as a futile and useless act.  Irreparable injury to Nation Energy would result by waiting, including but not limited to, the potential expiration of the injunction in Australia, the impairment of Plaintiffs' ability to raise capital for the benefit of Nation Energy and the diminution of the voting power of Hislop and Siegel on the boards of Nation Energy and Nation Australia.

201.    Plaintiff Hislop was a shareholder of Nation Energy at the time of the wrongdoing complained of, has continuously been a shareholder, and is a current shareholder.

## FIRST CLAIM FOR RELIEF
### (Breach of Fiduciary Duty Against Paltar)

202.    Plaintiff Hislop incorporates by reference each and every allegation set forth above, as though fully set forth herein.

203.    Paltar, as majority shareholder of Nation Energy, owed to Hislop, as a minority shareholder of Nation Energy, fiduciary duties, including but not limited to a duty of due care and a duty of loyalty.

204.    By reason of the acts and transactions complained of herein, Paltar breached its duties of loyalty and due care by not acting in the best interests of Nation Energy and its shareholders, but rather acting in bad faith and for its own corporate interests to the prejudice and detriment of Hislop.

205.    As a direct and proximate result of Paltar's breaches, Plaintiff Hislop has been damaged in an amount to be proven at trial.

206.    Moreover, Paltar's conduct, as alleged above, was oppressive, fraudulent and malicious and was committed willfully and/or with reckless disregard for Plaintiff Hislop's rights, and without just cause or excuse.  Accordingly, Plaintiff Hislop is entitled to exemplary damages from Paltar in an amount to be determined at trial.

207.    Plaintiff Hislop brings this cause of action individually and derivatively on Nation Energy's behalf.

## SECOND CLAIM FOR RELIEF
### (Breach of Fiduciary Duty and Violation of Wyoming Business Corporations Act 17-16-830 Against The Director Defendants)

208.    Plaintiff Hislop incorporates by reference each and every allegation set forth above, as though fully set forth herein.

209.    Each individual Director Defendant under the common law and under Wyoming Business Corporation Act 17-16-830 owed and owes to Nation Energy and Hislop, as a minority shareholder of Nation Energy and as a Nation Energy director, fiduciary duties, including but not limited to a duty of due care and a duty of loyalty.

210.    As set forth above, each of the Defendant Directors breached their duties of loyalty and due care by not acting in the best interests of Nation Energy and its shareholders, but rather acting in bad faith and for their own personal and corporate interests and favoring the interests of Paltar, the majority shareholder, and Fortem at the expense of Nation Energy and Hislop, its minority shareholder.

211.    As set forth above, each of the Director Defendants breached their duties of loyalty and due care and failed to act in good faith with respect to Nation Energy and its shareholders by, among other things:

    a.   failing to properly investigate and evaluate the purported notice of default issued by Paltar;

    b.   failing to make an informed and deliberate decision as to the validity of the default notice issued by Paltar;

c.   failing to seek legal advice from independent counsel who did not have a conflict of interest to evaluate the Paltar notice of default and proposed Surrender and Cancellation Agreement and the Settlement Agreement;

d.   failing to make an informed and deliberate decision as to whether the Surrender and Cancellation Agreement and the Settlement Agreement were in the best interests of Nation Energy;

e.   failing to disclose their conflicts of interest prior to voting to approve the Surrender and Cancellation Agreement and the Settlement Agreement;

f.   failing to disclose and concealing the fact that they knew of the default before it had even been issued and had agreed to surrender the Earning Agreements to Paltar well before the board meeting;

g.   failing to disclose that they had participated in negotiations with Fortem that would grant Fortem rights in the very same exploration permits that Nation Energy and Nation Australia were being asked to surrender;

h.   directing Nation Australia to enter into the Surrender and Cancellation Agreement and the Settlement Agreement; and

i.   misusing and abusing their controlling power to conflict with the proper conduct of Nation Energy's business, to benefit themselves, the majority shareholder Paltar and Fortem, and in a self-dealing manner detrimental to Nation Energy and Hislop.

212.    Each individual Director Defendant is sued individually and/or as a conspirator and aidor and abettor.  The liability of each arises from the fact that they have all engaged in all or part of the unlawful acts, plans, schemes, or transactions complained of herein.

213.    As a direct and proximate result of the Director Defendants' breaches of their fiduciary duties, Nation Energy has suffered and will continue to sustain damages and injuries for which it has no adequate remedy at law.

214.    Plaintiff Hislop brings this cause of action derivatively on Nation Energy's behalf.

**THIRD CLAIM FOR RELIEF**
**(Aiding and Abetting Breach of Fiduciary Duty Against Bruner)**

215.    Plaintiff Hislop incorporates by reference each and every allegation set forth above, as though fully set forth herein.

216.     The Director Defendants and Nisbet have a fiduciary duty to Nation Energy and its shareholders, including Hislop.

217.    Defendant Bruner knew that the Director Defendants and Nisbet were breaching fiduciary duties owed by them to Nation Energy and its shareholders.

218.    Defendant Bruner knowingly aided, cooperated and/or participated in, and substantially assisted the Director Defendants and Nisbet in the breaches of their fiduciary duties.

219.    Defendant Bruner's aiding and abetting of the Director Defendants' and Nisbet's breaches of fiduciary duties caused damages to Nation Energy and Plaintiff Hislop.

220.    Plaintiff Hislop brings this cause of action individually and derivatively on behalf of Nation Energy.

## FOURTH CLAIM FOR RELIEF
### (Fraudulent Concealment Against Paltar, Bruner, Lotito and Causbrook)

221.     Plaintiffs Siegel and the Siegel Family Trust incorporate by reference each and every allegation set forth above, as though fully set forth herein.

222.     Paltar, Bruner, Lotito and Causbrook concealed material existing facts from Siegel and the Siegel Family Trust relating to its intention to strip the Earning Agreements away from Nation Australia and enter into a new joint venture with Fortem for its own financial benefit and to the detriment of Nation Energy and Nation Australia.  Paltar, Bruner, Lotito and Causbrook concealed these material facts that in equity and good conscience should have been disclosed in order to induce Siegel and the Siegel Family Trust to (a) continue to fund Paltar's operation of the Exploration Permits, (b) loan Paltar money, and (c) pay for Nation Energy's expenses.

223.     Paltar, Bruner, Lotito and Causbrook knew the foregoing material facts were being concealed from Siegel and the Siegel Family Trust.  Siegel and the Siegel Family Trust were ignorant of the material facts concealed from them by Paltar, Bruner, Lotito and Causbrook.

224.     Paltar, Bruner, Lotito and Causbrook concealed the foregoing material facts with the intent that Siegel and the Siegel Family Trust act upon them and (a) continue to fund Paltar's operation of the Exploration Permits, (b) loan Paltar money, and (c) pay for Nation Energy's expenses.

225.     As a direct and proximate result of the fraudulent concealment, Plaintiffs Siegel and the Siegel Family Trust have been damaged in an amount to be determined at trial.

226.     Paltar, Bruner, Lotito and Causbrook acted fraudulently, maliciously and/or oppressively thus entitling Siegel and the Siegel Family Trust to punitive and exemplary damages in an amount to be proven at trial.

## FIFTH CLAIM FOR RELIEF
### (Violation of 18 U.S.C. 1962(c)—Civil Rico Against All Defendants)

227.     Plaintiffs incorporate by reference each and every allegation set forth above, as though fully set forth herein.

228.     Under 18 U.S.C. § 1962(c), it is unlawful for "any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity."  This is the Racketeer Influenced and Corrupt Organizations Act or "RICO."

229.     RICO creates a private right of action for "[a]ny person injured in his business or property by reason of a violation of [18 U.S.C. § 1962.]" 18 U.S.C. § 1964(c).

230.     Defendants associated together to form an enterprise to achieve a common objective, namely the defrauding of Hislop, Siegel and the Siegel Family Trust into loaning money to Paltar and using money from investors to allow Paltar to continue its operation of the Exploration Permits and to pay for Nation Energy's expenses while intending to strip Nation Australia of the Earning Agreements and enter into other arrangements relating to the Exploration Permits with another entity controlled by Bruner (Fortem) for their own personal pecuniary gain.

231.     The RICO enterprise consisted of Paltar, Bruner, the Director Defendants, the Doe Defendants and the innocent corporations they control, Nation Energy and Nation Australia,

functioning together as an ongoing operation, associating in fact for the purpose of defrauding Hislop, Siegel and the Siegel Family Trust.  The Defendants associated together for the purpose of engaging in a fraudulent course of conduct, and they formed an ongoing organization, formal or informal, that functioned as a continuing unit to achieve their common fraudulent purpose, with sufficient longevity to permit them to achieve the enterprise's purpose. These enterprises exist apart from the pattern of racketeering activity because they have an existence beyond which is necessary to commit racketeering activity. Defendants participated in the operation or management of the enterprise.

232.    In addition to the joint association of all the Defendants being a RICO enterprise, Paltar as a corporation is an enterprise for purposes of the RICO violations of all defendants except Paltar.  See 18 U.S.C. § 1961(4).

233.    Defendants exercised a managerial role in the enterprise's affairs. Defendant Bruner, the Director Defendants and the Doe Defendants are distinct from the enterprises alleged in this complaint. Defendant Bruner, the Director Defendants and the Doe Defendants controlled the affairs of the enterprise.  They each also controlled and directed the affairs of Paltar, which is a RICO enterprise, and the innocent corporations Nation Energy and Nation Australia.

234.    Defendants conducted or participated in the conduct of the enterprise's affairs through a pattern of racketeering activity.   Bruner, the Director Defendants and the Doe Defendants knowingly participated in the unlawful enterprises.

235.    Defendants have committed multiple acts of racketeering activity within 10 years of each other that were continuous and interrelated.   The acts of racketeering activity are violations of federal mail and wire fraud statutes described above, all for the purpose of

defrauding Hislop, Siegel and the Siegel Family Trust.   See e.g., 18 U.S.C. § 1961(1)(B) (defining "racketeering activity" to include any act indictable under section 1341 (relating to mail fraud) or section 1343 (relating to wire fraud)).

236.   Bruner, Caetano, Causbrook, Lotito, Nisbet and Paltar furthered their scheme using the U.S. Mail, interstate and foreign carriers and/or interstate and foreign wire. The use of the U.S. Mail, and interstate and foreign carriers or interstate and foreign wire (i.e., email) was an instrumentality by which Bruner, Caetano, Causbrook, Lotito, Nisbet and Paltar concealed their wrongful scheme, and committed mail and wire fraud, to further their scheme.

237.   By reason and as a proximate result of Defendants' racketeering activities, Plaintiffs have suffered damages.   This damage included, but was not limited to, deprivation of the funds they provided to Paltar and Nation Energy and their creditors based on Defendants' fraudulent concealment.   This damage also includes diminution of the voting power of Hislop and Siegel on the boards of Nation Energy and Nation Australia.

238.   The activity of the enterprises, and Defendants' commission of mail and wire fraud, affected interstate commerce by causing financial harm to Plaintiffs and depriving them of their property.

239.   Defendants' acts of racketeering activity meet the requirements under federal law for establishing a close-ended scheme or an open-ended scheme. Defendants acts qualify as a close-ended scheme because Defendants' inducement of Plaintiffs to provide substantial loans on over 10 separate occasions from August 26, 2015 to March 10, 2017 was accomplished similar purposes, with similar results, similar participants, related victims, and methods of commissions. Specifically, Defendants induced Plaintiffs—who are associated with and related to Nation

Energy—to fund Paltar's and Nation Energy's operations for the purpose of carrying out Paltar's

deal with Nation Energy. Defendants made the same or substantially the same false

representations to Plaintiffs over interstate or international email that funds were needed to carry

out the deal and concealed material facts from Plaintiffs. And Defendants achieved the same

results—obtaining loans through fraud—by those representations and their concealment of

material facts. Defendants' acts qualify as a close-ended scheme. Those acts also qualify as an

open-ended scheme. As alleged above, Defendants are prevented in part from proceeding with

their racketeering activity only by an injunction currently in place in Australia. The issuance of

the injunction establishes a threat of continuity in the future.

240.    Pursuant to 18 U.S.C. § 1964(c), Plaintiffs are entitled to recover threefold the

damages sustained as a result of Defendants' fraudulent racketeering conspiracy, the cost of the

suit, plus reasonable attorney fees.

**SIXTH CLAIM FOR RELIEF**
**(Violation of Colorado Organized Crime Control Act ("COCCA")—**
**Against All Defendants)**

241.    Plaintiffs incorporate by reference each and every allegation set forth above, as

though fully set forth herein.

242.    Paltar, Bruner, the Director Defendants, Nisbet, the Doe Defendants and the

innocent corporations they control, Nation Energy and Nation Australia constitute "enterprises"

within the meaning of C.R.S. § 18-17-103(2). In addition, Paltar, Bruner, the Director

Defendants, Nisbet, the Doe Defendants and the innocent corporations they control, Nation

Energy and Nation Australia acted together as a group associated in fact, and that association

itself constituted an "enterprise" within the meaning of C.R.S. § 18-17-103(2). These enterprises

exist apart from the pattern of racketeering activity because they have an existence beyond which is necessary to commit racketeering activity.

243.    Paltar, Bruner, the Director Defendants, Nisbet, the Doe Defendants and the innocent corporations they control, Nation Energy and Nation Australia are COCCA persons employed by or associated with the COCCA enterprises within the meaning of C.R.S. § 18-17-104(3).

244.    Through their actions as set forth above, Paltar, Bruner, Nisbet, the Director Defendants, the Doe Defendants and the innocent corporations they control, Nation Energy and Nation Australia each conducted and/or participated in the affairs of the COCCA enterprises, directly or indirectly through a pattern of racketeering activity within the meaning of C.R.S. § 18-17-103(3).

245.    The racketeering activity included mail and wire fraud under 18 U.S.C. § 1341 and § 1343, as alleged above in this complaint.

246.    With respect to mail and wire fraud, as set forth more particularly above, Defendants developed a scheme to defraud Plaintiffs and obtain money and property by means of fraudulent concealment.

247.    Defendants engaged in a "pattern" of racketeering activity because they engaged in multiple predicate acts of mail and wire fraud that were related and furthered the scheme to defraud a variety of victims, including Hislop, Siegel, Nation Energy, Nation Australia, and others. These predicate acts included fraudulently inducing various innocent victims to loan or provide funds on over 10 discrete occasions, as alleged above in paragraphs 114-125 and 135, based on Defendants' false, fraudulent, and misleading interstate and international emails

requesting money to carry out deals or agreements that Defendants had no intention of honoring and their concealment of their fraudulent intent. These predicate acts also include diminishing or diluting the voting power of Hislop and Siegel on the Nation Energy Board and Nation Australia Board in order to enable Defendants to take over Nation Energy and Nation Australia.

248.   As a result of Defendants' pattern of racketeering activity, Hislop and Siegel have been damaged and harmed beyond their interest as shareholders. In addition to the harm they experienced as shareholders, and in addition to the harm identified above in paragraphs 114-125 and 135, the takeover scheme substantially diminished and diluted their voting power as board members of Nation Energy.

249.   Plaintiffs were directly and proximately injured by reason of the predicate acts and Defendants' violations of C.R.S. §§ 18-17-104(3) and 104(4). But for Defendants' pattern of racketeering activity, Plaintiffs would not have suffered the above-described harm and would not have incurred attorney fees in proceedings in Australia to obtain injunctive relief.

250.   Because of Defendants' commission of the predicate acts and violations of C.R.S. §§ 18-17-104(3) and 104(4), Plaintiffs have suffered monetary damage to their business and other harms in an amount to be proved at trial.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request the following relief:

1.   An order granting an injunction (a) prohibiting (i) action to be taken by Paltar on the Surrender and Cancellation Agreement and/or the Settlement Agreement; and (ii) Paltar from transferring the Exploration Permits or entering into agreements relating to the Exploration Permits that would grant interests or rights in the Exploration Permits or any production licenses

issued to Paltar to any other entity or person; and (b) directing Paltar to restore the Earning

Agreements between Paltar and Nation Australia relating to EP 136, EP 143, EP 231, EP 232, EP

234 and EP 237.

2.      An order declaring that Defendants have breached their fiduciary duties to

Plaintiff Hislop and Nation Energy and aided and abetted such breaches.

3.      An order enjoining the Director Defendants and Nesbit from acting as officers and

directors of Nation Energy.

4.      An order declaring void all the actions taken by the Director Defendants and

Nesbit as a result of their breaches of fiduciary duties.

5.      An order rescinding any issuance of shares of Nation Energy common stock to

Paltar pursuant to the Settlement Agreement.

6.      An award of monetary damages against all Defendants, jointly and severally, in

favor of Plaintiffs for any and all losses and damages suffered as a result of the acts and

transactions complained of herein.

7.      An award of treble damages and attorneys' fees as permitted by 18 U.S.C.

§ 1964(c).

8.      An award of punitive damages against all Defendants.

9.      An award to Plaintiffs for the costs of this action, including their reasonable

attorney fees, accountants' and experts' fees, costs, other expenses, and other damages permitted

by law.

10.     For punitive and exemplary damages according to proof at trial.

11.     Pre- and post-judgment interest, and all other interest recoverable under applicable law.

12.     All further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiffs demand a trial by jury.

Dated:  September 29, 2017                    Respectfully submitted,


                                              *s/ Evan Bennett Stephenson*
                                              Michael L. O'Donnell
                                              Evan Bennett Stephenson
                                              Wheeler Trigg O'Donnell LLP
                                              370 Seventeenth Street, Suite 4500
                                              Denver, CO  80202-5647
                                              Telephone:  303.244.1800
                                              Facsimile:   303.244.1879
                                              Email:  odonnell@wtotrial.com
                                                            stephenson@wtotrial.com

                                              Attorneys for Plaintiffs