IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge R. Brooke Jackson

Civil Action No 17-cv-02371-RBJ

JOHN HISLOP, individually and derivatively on behalf of
NATION ENERGY INC.,
DAVID N. SIEGEL, and
ROBERT TELLES, as Trustee of DAVID N. SIEGEL FAMILY
TRUST 2015,

    Plaintiff,

v.

PALTAR PETROLEUM LIMITED, an Australian corporation,
MARC BRUNER,
MICHAEL CAETANO,
CARMEN LOTITO,
DARREL CAUSBROOK,
ROBERT BULJEVIC,
ROBERT MADZEJ,
BELINDA NISBET, and
DOES 1-20,

    Defendants.

## ORDER

There are two matters before the Court. First, defendants have filed several motions relating to personal jurisdiction. ECF Nos. 46, 78, 80. Second, plaintiffs move for an order requiring payment of service costs on defendants who evaded service. ECF No. 86. For the reasons stated below, the motions to dismiss are GRANTED under the doctrine of forum non conveniens, and the motion for costs is DENIED.

# I. BACKGROUND

This lawsuit was brought by four plaintiffs: (1) John Hislop, a Canadian citizen residing in England; (2) David Siegel, a U.S. citizen residing in Florida; (3) the David N. Siegel Family Trust 2015, a trust organized under Colorado laws; and (4) Nation Energy, Inc., a Wyoming shell company (Hislop filed derivatively on behalf of Nation Energy). Complaint, ECF No. 1 at ¶¶20–22, 209. There are eight defendants: (1) Paltar Petroleum Limited, an Australian corporation; (2) Marc Bruner, a resident of Switzerland; (3) Michael Caetano, a resident of Canada; (4) Michael Lotito, a resident of either Colorado (according to plaintiffs) or Utah (according to defendants); (5) Darrel Causbrook, a resident of Australia; (6) Robert Buljevic, a resident of Canada; (7) Robert Madzej, a resident of Canada; and (8) Belinda Nisbet, a resident of Canada. Plaintiffs also join Does 1-20 as potential plaintiffs. *Id.* at ¶¶23–31.

In 2012, Paltar acquired oil and gas exploration permits issued by the Northern Territory of Australia but lacked the necessary funds for the exploration and development of the permits. *Id.* at ¶2. So in 2015, Paltar and Nation Energy agreed to a joint venture where Paltar would execute the permits, and Nation Energy would provide the funding. *Id.* at ¶3. To close the deal, Mr. Hislop—the previous majority shareholder of Nation Energy—agreed eventually to become a minority shareholder, and Paltar would eventually take over as majority shareholder of Nation Energy. *Id.* at ¶4. But Nation Energy was supposed to benefit from the deal as well. In return for Nation Energy's funding, Nation Energy's wholly-owned subsidiary, Nation Energy (Australia) Pty Ltd. ("Nation Australia"), was to earn interest in production licenses issued to Paltar. *Id.* at ¶5. These royalty deals were memorialized in a series of "earning agreements" between Nation Australia and Paltar. *Id.*

The relationship turned sour when defendants became concerned about Nation Energy's ability to provide funding for the venture. *Id.* at ¶6. Plaintiffs believe the concern was baseless because all parties understood at the venture's inception that Nation Energy did not have the funds to finance Paltar's operation. *Id.* Also, plaintiffs claim that Nation Energy raised millions from investors in 2016, but their fundraising efforts were disrupted by defendants. *Id.*

In response to the fundraising concerns, plaintiffs allege that Paltar's chairman, Mr. Bruner, formulated a wrongful scheme in March 2017 "to strip Nation Energy and Nation Australia of the earning agreements and defraud Nation Energy's minority shareholder and investors." *Id.* at ¶7. To execute the scheme, defendants allegedly planned to declare a fraudulent default by Nation Australia requiring them to surrender their interests to Paltar. *Id.* This scheme was part of a larger plan for Paltar to free itself of its contractual relationship with Nation Australia so that Paltar could then enter into a joint venture with one of Mr. Bruner's companies—Fortem Resources, Inc. ("Fortem"). *Id.* Once the secret scheme was in place, Mr. Bruner and his co-conspirators fraudulently induced plaintiffs to use plaintiffs' funds held in their lawyer's COLTAF trust account to pay Paltar's and Nation Energy's creditors. *Id.* at ¶8.

Next came the alleged wrongful takeover of Nation Energy's and Nation Australia's boards of directors. From June 2016 to April 2017, Nation Energy's board consisted of Mssrs. Hislop, Siegel, and Causbrook. *Id.* at ¶9. Then on April 27, 2017 Mr. Bruner unilaterally increased the size of Nation Energy's board from three to seven and then stacked the board with his co-conspirators. *Id.* Two of those co-conspirators, Mr. Caetano—Fortem's chairman and CEO at the time, and Mr. Lotito—one of Paltar's officers, were appointed to the board. *Id.* (The complaint does not name the other two alleged "co-conspirators" that Mr. Bruner appointed to the newly created directorships.) Once in control of Nation Energy's board, Mr. Bruner ousted

3

Mr. Siegel as chairman of the board and Mr. Hislop as president and CEO. *Id.* at ¶10. In their place, the board appointed Mr. Caetano as chairman, president, and CEO; Mr. Lotito as chief operating officer ("COO"); and Ms. Nisbet as secretary. *Id.*

Two months later, "Bruner's Nation Energy Board" ousted Siegel, Mssrs. Hislop, and Nation Australia's then-CEO Andrew Logan from Nation Australia's board. *Id.* at ¶11. After the ouster, Mr. Bruner installed Mr. Caetano, Caetano's associate Mr. Madzej, and Paltar director Causbrook to Nation Australia's board; Mr. Caetano became board chair and CEO of Nation Australia. *Id.* This same month, Mssrs. Caetano and Lotito allegedly seized control of the COLTAF trust account and replaced Mr. Siegel as the account manager. *Id.* at ¶14.

Now in control of both boards, the conspiracy allegedly came to life. Mssrs. Bruner, Caetano, Lotito, Causbrook, Nisbet, and others formulated a deal among Paltar, Fortem, and Nation Energy. *Id.* at ¶12. The plan called for Paltar to issue a default notice to Nation Australia demanding Nation Australia surrender its interest in the earning agreements to Paltar. *Id.* Once surrendered, Paltar would enter into a joint venture with Fortem to profit on the Australian exploration permits. *Id.* If the plan succeeded, both Nation Australia and Nation Energy would lose their interests in future Australian petroleum revenue—the sole purpose of their relationship with Paltar. *Id.*

By July 2017 Paltar and Nation Energy had already prepared a settlement agreement, and Paltar and Fortem had begun to form and document their joint venture. *Id.* at ¶15. To further the alleged conspiracy Mr. Bruner caused Paltar to "declare a fraudulent 'default' under the earning agreements." Paltar's reason for the default was that Nation Australia failed to make its required payments due under the earning agreements. *Id.* In August 2017 Mr. Bruner's Nation Energy board voted to approve "(1) the termination of the earning agreements, (2) the execution of a

4

settlement agreement with Paltar, and (3) the surrender all of Nation Energy's and Nation Australia's rights to Paltar"; Hislop and Siegel objected. *Id.* at ¶16. Plaintiffs alleged that defendants concealed from the dissenters the pending deal between Paltar and Fortem, which created a conflict of interest. *Id.*

Mssrs. Caetano and Madzej then voted as Nation Australia directors to approve the settlement with Paltar along with the surrender and cancellation of the earning agreements. *Id.* at ¶17. They executed both settlements and cancellations causing Nation Energy irreparable harm. *Id.* at ¶18.

Plaintiffs brought this lawsuit to redress alleged fraud and racketeering, breaches of fiduciary duties, and wrongful conduct that cost Nation Energy to lose valuable assets. *Id.* at ¶1. Plaintiffs allege six claims for relief: (1) breach of fiduciary duty against Paltar; (2) breach of fiduciary duty and violation of Wyoming Business Corporations Act against the director defendants; (3) aiding and abetting breach of fiduciary duty against Mr. Bruner; (4) fraudulent concealment against Mssrs. Paltar, Bruner, Lotito, and Causbrook; (5) civil RICO claims against all defendants; and (6) violation of Colorado's Organized Crime Control Act against all defendants.

## II. STANDARD OF REVIEW

A district court has authority to dismiss a case on forum non conveniens grounds without first determining if it has personal jurisdiction over the defendants. *Archangel Diamond Corp. Liquidating Tr. v. Lukoil*, 812 F.3d 799, 803–04 (10th Cir. 2016) (citing *Sinochem Int'l Co. Ltd. v. Malaysia Int'l Shipping Corp.,* 549 U.S. 422, 425 (2007) ("[A] court need not resolve whether it has authority to adjudicate the cause (subject-matter jurisdiction) or personal jurisdiction over the defendant if it determines that, in any event, a foreign tribunal is plainly the more suitable

5

arbiter of the merits of the case.")). In this case, I assume without deciding that plaintiffs have met their burden of showing personal jurisdiction under Rule 12(b)(2) because I conclude that the motions to dismiss are more appropriate for resolution under the doctrine of forum non conveniens.

Under the doctrine of forum non conveniens, a court "may, in the exercise of its sound discretion, dismiss the case, even if jurisdiction and proper venue are established." *Yavuz v. 61 MM, Ltd.*, 576 F.3d 1166, 1172 (10th Cir. 2009) (quoting *Am. Dredging Co. v. Miller*, 510 U.S. 443, 447 (1994) (internal quotation marks omitted)). "The burden is on the moving party to establish the need for a *forum non conveniens* transfer . . . ." *Rivendell Forest Prod., Ltd. v. Canadian Pac. Ltd.*, 2 F.3d 990, 993 (10th Cir. 1993). The moving party typically must overcome the "strong presumption in favor of hearing the case in the plaintiff's chosen forum . . . ." *Yavuz*, 576 F.3d at 1172 (quoting *Gschwind v. Cessna Aircraft Co.*, 161 F.3d 602, 606 (10th Cir. 1998)). "A foreign plaintiff's choice of forum, however, warrants less deference." *Gschwind*, 161 F.3d at 606.

There are two threshold inquires that must be met before a court may transfer a case to a foreign country under the doctrine. *Id.* First, there must be an adequate and available alternative forum. *Archangel Diamond Corp. Liquidating Tr. v. Lukoil*, 812 F.3d 799, 804 (10th Cir. 2016). The first requirement is typically met when all defendants consent to the jurisdiction of the foreign court. *Gschwind*, 161 F.3d at 606. Second, foreign law must be applicable. *Id.* To answer this step, the district court must apply the applicable conflict of law principles. *Archangel*, 812 F.3d at 804. If there are some claims governed by foreign law and others governed by domestic law, the court must determine which claims predominate. *Id.* (holding that even when a plaintiff asserts a RICO claim governed by U.S. law, dismissal under forum

non conveniens was appropriate because Russian law applied to the vast majority of the underlying disputes).

If both threshold requirements are satisfied, the district court goes on to weigh private and public interest factors to determine whether to dismiss the case. *Id.* The private interest factors include:

> (1) the relative ease of access to sources of proof; (2) availability of compulsory process for compelling attendance of witnesses; (3) cost of obtaining attendance of willing non-party witnesses; (4) possibility of a view of the premises, if appropriate; and (5) all other practical problems that make trial of the case easy, expeditious and inexpensive.

*Gschwind*, 161 F.3d at 606. For the public interest factors, courts weigh the following:

> (1) administrative difficulties of courts with congested dockets which can be caused by cases not being filed at their place of origin; (2) the burden of jury duty on members of a community with no connection to the litigation; (3) the local interest in having localized controversies decided at home; and (4) the appropriateness of having diversity cases tried in a forum that is familiar with the governing law.

*Id.* Although the burden remains with the defendant as the moving party, the burden of pleading the private and public interest factors is lighter when dealing with a foreign plaintiff. *Gschwind*, 161 F.3d at 606.

### III. ANALYSIS

In their motions to dismiss, defendants ask that this Court dismiss the entire case under the forum non conveniens doctrine because Australia is a more convenient forum. Plaintiffs prefer to litigate the case in this Court. I first address the threshold requirements and then turn to the private and public interest factors.

**A. Adequate and Available Alternative Forum.**

Defendants make two arguments to establish that Australia is an adequate and available forum. First, they allege that plaintiffs cannot contend that Australia is not an adequate and

7

available forum because plaintiffs have already filed suit there. ECF No. 46 at 13; ECF No. 114 at 1. Second, all eight defendants signed a declaration under the penalty of perjury stating they would consent to the jurisdiction of the Federal Court of Australia should this Court dismiss on forum non conveniens grounds. ECF No. 114 at 2; ECF No. 114-3 at 1–16. Plaintiffs argue that just because Mr. Hislop filed a derivative action against Nation Australia's directors for their breaches of fiduciary duties in Australia, that doesn't guarantee that the Australian court will exercise jurisdiction over Plaintiff Nation Energy, a Wyoming company.

I find that Australia is an adequate and available forum. To begin, Mr. Hislop obtained an injunction in Australia against Paltar and the directors of Nation Australia—Mssrs. Causbrook, Madzej, and Caetano—preventing them from implementing their allegedly wrongful plan to strip Nation Australia of their interests in the earning agreements. ECF No. 98 at 5. Mr. Hislop then filed a derivative action on behalf of Nation Austria against Mssrs. Causbrook, Madzeq, and Caetano alleging breach of the directors' fiduciary duties and an equitable fraud claim against Paltar. *Id.* The Australian case is stayed by agreement, but if I dismiss this lawsuit on forum non conveniens grounds, the agreement will lapse. ECF No. 98 at 5; ECF No. 114 at 2 n.4.

Second, each defendant consents to Australian jurisdiction. There is no reason to assume that Australian courts will not exercise jurisdiction over Nation Energy, especially considering that Nation Energy is a plaintiff and all defendants consent to jurisdiction. Given the success plaintiffs have already had in Australia, and given that a case there is stayed pending my ruling on this motion, Australian courts provide an adequate and available forum.

8

B.  **Choice of Law.**

If domestic law controls this dispute, forum non conveniens is improper. *Archangel*, 812 F.3d at 804. Defendants argue that the law of the Northern Territory of Australia will apply because plaintiffs' case centers on the earning agreements, and the agreements contain a choice of law provision. ECF No. 46 at 13; ECF No. 80 at 7. Defendants attach an "EP 136 Final Earning Agreement" between Paltar and Nation Australia. ECF No. 80-2, Ex. 2. Under the law and arbitration section, the earning agreement states, "This Agreement shall be governed by, construed, interpreted and applied in accordance with the laws of the Northern Territory [of Australia] . . . ." *Id.* The agreement also requires arbitration, which shall take place in Australia. *Id.*

Plaintiffs call the choice of law provision in the earning agreements a "red herring" because they did not sue defendants for a breach of those agreements. ECF No. 98 at 32. Plaintiffs believe U.S. law governs each claim. *Id.*

For present purposes, the Court assumes that it has federal question jurisdiction under 28 U.S.C. § 1331 because plaintiffs assert a RICO claim. Also for present purposes, the Court assumes that it has supplemental jurisdiction over the five state-law claims per 28 U.S.C. § 1367. This is relevant to the choice of law inquiry. For the federal question claim, I will apply federal common law. *Bd. of Cty. Commissioners of the Cty. of Kay, Oklahoma v. Freeport-mcmoran Copper & Gold, Inc.*, No. CIV-12-601-C, 2013 WL 12093009, at *2 (W.D. Okla. Sept. 5, 2013) (unpublished). "Absent guidance from Congress, federal courts apply the choice of law rules found in the Restatement (Second) of Conflicts of Law." *Id.* RICO contains no such guidance concerning choice of law rules. For the supplemental jurisdiction claims, I apply the choice of law rules of the forum state. *BancOklahoma Mortg. Corp. v. Capital Title Co.*, 194 F.3d 1089,

1103 (10th Cir. 1999). Like federal common law, Colorado follows the Restatement (Second) of Conflicts of Law. *Kipling v. State Farm Mut. Auto. Ins. Co.*, 774 F.3d 1306, 1310 (10th Cir. 2014). Therefore, I will apply the Restatement for all six claims.

Section 6 of the Restatement lays out the choice of law principles. Restatement (Second) of Conflict of Laws § 6 (1971). Section 6 explains that where there is no statutory directive, the relevant factors to determine which forum's substantive law should apply include:

> (a) the needs of the interstate and international systems,
> (b) the relevant policies of the forum,
> (c) the relevant policies of other interested states and the relative interests of those states in the determination of the particular issue,
> (d) the protection of justified expectations,
> (e) the basic policies underlying the particular field of law,
> (f) certainty, predictability and uniformity of result, and
> (g) ease in the determination and application of the law to be applied.

*Id.* The Restatement provides additional guidance for tort claims. *Id.* § 145. Those factors include:

> (1) The rights and liabilities of the parties with respect to an issue in tort are determined by the local law of the state which, with respect to that issue, has the *most significant relationship* to the occurrence and the parties under the principles stated in § 6.
> (2) Contacts to be taken into account in applying the principles of § 6 to determine the law applicable to an issue include:
> (a) the place where the injury occurred,
> (b) the place where the conduct causing the injury occurred,
> (c) the domicil, residence, nationality, place of incorporation and place of business of the parties, and
> (d) the place where the relationship, if any, between the parties is centered.

*Id.* (emphasis added).

With those factors in mind, I find that Australia, not Colorado, bears the most significant relationship to the underlying dispute in this case. Defendants Paltar, Causbrook, and Nisbet are citizens of Australia. ECF No. 1 at 8–9. No plaintiffs are residents of Colorado, and only one defendant, Mr. Lotito, is a resident of Colorado (a fact defendants dispute). *Id.* at 9. In addition,

Colorado courts typically apply corporate law of the defendant's state of incorporation to assess the responsibility of its board of directors. *Great W. Producers Co-op. v. Great W. United Corp.*, 613 P.2d 873, 878 n.4 (Colo. 1980). Because Paltar is an Australian corporation, I would have to apply corporate law of Australia for the breach of fiduciary duty claim against Paltar.

The relationships between plaintiffs and defendants also are centered in Australia, not Colorado. The primary reason plaintiffs' and defendants' relationship exists is because plaintiffs agreed to finance Paltar's development of Australian oil and gas exploration permits. ECF No. 98 at 2–3. In return, Nation Energy and Nation Australia would receive earnings and royalty from Australia oil and gas revenue. *Id.* at 3. The agreements that govern this relationship are called earning agreements. *Id.* A review of plaintiffs' complaint highlights that these earning agreements are central to the dispute in this case.

- "At some point, but in any event no later than March 2017, Paltar's Chairman Marc Bruner ("Bruner") formulated a wrongful scheme to strip Nation Energy and Nation Australia of the earning agreements and defraud Nation Energy's minority shareholder and investors. Unknown to Plaintiffs, Bruner and his co-conspirators planned to declare a fraudulent default by Nation Australia under the earnings agreements and cause Nation Australia to surrender its interests to Paltar." ECF No. 1 at ¶7.

- "Once in control of the Nation Energy Board and the Nation Australia Board, in violation of their fiduciary duties and in furtherance of the conspiracy and racketeering, Bruner, Caetano, Lotito, Causbrook, Nisbet and others orchestrated a deal between Paltar, Fortem and Nation Energy. The deal was for (a) Paltar to issue a default notice to Nation Australia demanding the surrender of its interest in the earning agreements to Paltar, (b) Nation Australia to surrender its interests in the earning agreements to Paltar, and (c)

Paltar to enter into a joint venture agreement with Fortem for the development of the exploration permits. The result would be the near total loss of Nation Australia and Nation Energy's interests in future petroleum revenues and the 50/50 sharing of future petroleum revenues between Paltar and Fortem." *Id.* at ¶12. The exploration permits were issued by the Northern Territory of Australia. *Id.* at ¶2.

- "In August 2017, in violation of their fiduciary duties and in furtherance of the conspiracy and racketeering, Bruner's Nation Energy Board voted over the objections of Board members Hislop and Siegel to approve (1) the termination of the earning agreements, (2) the execution of a settlement agreement with Paltar, and (3) the surrender all of Nation Energy's and Nation Australia's rights to Paltar." *Id.* at ¶16.

- Paltar and its co-conspirators fraudulently induced plaintiffs when they "concealed their plan from Plaintiffs to strip the earning agreements from Nation Australia and to violate the parties' agreements." *Id.* at ¶110.

- "In violation of his fiduciary duties, and in furtherance of the conspiracy and racketeering, Bruner appointed his co-conspirators to the four newly created positions so that they could carry out his wrongful plan to strip Nation Energy and Nation Australia of its assets: Caetano, Lotito, Robert Buljevic ("Buljevic"), and Madzej (collectively, "Bruner's Nation Energy Board")." *Id.* at ¶138.

- "In connection with proceedings in Australia (described below), Paltar produced a number of highly incriminating interstate and international emails . . . . The emails reveal that Paltar and Fortem began negotiating the terms of a joint venture between Paltar and Fortem relating to the Exploration Permits long before Paltar issued the fraudulent notice of default to Nation Australia. The emails show that the default notice was a sham and an

independent and premediated part of the larger scheme to strip the Earning Agreements from Nation Australia." *Id.* at ¶163.

- "Once the co-conspirators had together finalized the "default" notice, on July 10, 2017, in furtherance of the conspiracy and racketeering, Bruner caused Paltar and its subsidiary to issue a fraudulent notice of default to Nation Australia under the Earning Agreements." *Id.* at ¶168.

- "Defendants associated together to form an enterprise to achieve a common objective, namely the defrauding of Hislop, Siegel and the Siegel Family Trust into loaning money to Paltar and using money from investors to allow Paltar to continue its operation of the Exploration Permits and to pay for Nation Energy's expenses while intending to strip Nation Australia of the Earning Agreements and enter into other arrangements relating to the Exploration Permits with another entity controlled by Bruner (Fortem) for their own personal pecuniary gain." *Id.* at ¶230.

- Plaintiffs' first prayer for relief asks for an "order granting an injunction (a) prohibiting (i) action to be taken by Paltar on the Surrender and Cancellation Agreement and/or the Settlement Agreement; and (ii) Paltar from transferring the Exploration Permits or entering into agreements relating to the Exploration Permits that would grant interests or rights in the Exploration Permits or any production licenses issued to Paltar to any other entity or person; and (b) directing Paltar to restore the Earning Agreements between Paltar and Nation Australia relating to EP 136, EP 143, EP 231, EP 232, EP 234 and EP 237." *Id.* at 51–52.

These nine paragraphs convince me that the subject matter of the suit centers around the earning agreements. These earning agreements are governed by Australian law. Applying Australian law would protect the parties' contractual expectations and provide predictability.

In sum, although Australian law may not apply to the entire controversy, I find that Australian law applies to the majority of the disputes in this case, and that foreign law predominates.

**C. Balance of Private and Public Interest Factors.**

Having determined that both threshold requirements are met, I proceed to weigh the private and public interest factors.

1. Private Interest Factors.

Neither party sheds much light on the private interest factors. Defendants allege that the principal witnesses in this case are the parties. Since the majority of the parties live overseas, and none (or possibly one) of the parties lives in Colorado, they argue Colorado would be inconvenient. ECF No. 46 at 14. Plaintiffs respond that defendants have not established that the private interest factors weigh so heavily in their favor as to warrant dismissal. ECF No. 98 at 33.

Keeping in mind that the private and public interest factors need not weigh quite so heavily in favor of defendants when dealing with foreign plaintiffs, I find that the private interest factors weigh slightly in defendants' favor. No party resides in Colorado with the possible exception of one defendant, so each party will be required to travel for trial. Mr. Hislop is the main plaintiff, and he resides in England. *Id.* at 7. Also, because each defendant has signed a declaration consenting to Australian jurisdiction, I foresee no issue of compelling attendance of witnesses in Australia. However, if I keep the lawsuit in this Court, I could foresee issues of trying to compel or arrange the attendance of witnesses from three separate continents.

14

2. Public Interest Factors.

Defendants allege that the main issue in the case is whether Nation Australia, an Australian company, breached its contracts with Paltar, another Australian company. ECF Nos. 46 at 14; 113 at 3; 114 at 1–2. Those contracts, the earning agreements, involve Australian oil and gas resources and Australian oil and gas permits issued by the Australian government. ECF No. 46 at 14. Thus, Australian courts would have a strong interest in hearing this dispute concerning Australian law and Australian resources. *Id.* With the central focus in Australia, defendants argue that the District of Colorado and Colorado citizens should not be burdened with a lawsuit having no connection to the state. *Id.* In response, plaintiffs allege that the thrust of this case has direct and substantial connections with Colorado as evidenced in their entire response. ECF No. 98 at 34.

Like the private interest factors, I find that the public interest factors weigh in defendants' favor. Plaintiffs have filed suit in Australia and have had success. Having already expended judicial resources in Australia, it makes sense to keep the case in Australia. Australia certainly has an interest in interpreting and applying its laws in a case involving Australian companies and Australian oil and gas resources.

**D. Forum Non Conveniens Conclusion.**

In sum, I find that this case is suitable for dismissal under the forum non conveniens doctrine. Australian courts are available and adequate, and the majority of the claims will be governed by Australian law. Both the private and public interest factors weigh in favor of dismissal. Accordingly, defendants' motions to dismiss under the doctrine of forum non conveniens is granted.

## IV. ORDER REQUIRING PAYMENT OF COSTS OF SERVICE OF PROCESS

Plaintiffs ask that the Court award $17,000 in costs and fees associated with the service of process in this case. ECF No. 86 at 1. Plaintiffs argue that defendants Bruner, Caetano, and Paltar acted in bad faith to avoid service, thus resulting in unnecessary litigation expenses. *Id.* at 11–12. Defendants argue that plaintiffs' entire motion is based on hearsay, false statements, and misstatements of fact. ECF No. 90 at 1. In their cross-motion/response, defendants ask the Court to sanction plaintiffs for their false misrepresentations to the Court and further ask the Court to award their costs and attorney's fees incurred in responding to this motion. *Id.* at 8.

Plaintiffs correctly point out that Rule 4(d)(2)'s cost-shifting provision does not apply in this case because Mssrs. Bruner, Caetano, and Paltar are foreign defendants. Fed. R. Civ. P. 4(d)(2). Thus, to award the costs and fees requested by the plaintiffs, the Court would have to use its "inherent powers . . . to fashion an appropriate sanction for conduct which abuses the judicial process." *Chambers v. NASCO, Inc.*, 501 U.S. 32, 44–45 (1991). To use this inherent power to impose sanctions, most courts require a showing of "bad faith" by clear and convincing evidence. *See Farmer v. Banco Popular of N. Am.*, 791 F.3d 1246, 1255 (10th Cir. 2015); *Ali v. Tolbert*, 636 F.3d 622, 626–27 (D.C. Cir. 2011).

I decline to exercise this Court's inherent powers to impose sanctions on defendants. While there is some evidence of bad faith on behalf of Mssrs. Bruner, Caetano, and Paltar, the circumstances as a whole do not amount to clear and convincing evidence of bad faith. Many of plaintiffs' accusations appear to be matters of assumptions and speculation. It is foreseeable that there will be substantial litigation costs when plaintiffs file suit against eight defendants located on three different continents. Plaintiffs have not convinced me that defendants have acted in bad faith.

Likewise, I decline to award costs and fees or to impose Rule 11 sanctions against plaintiffs. "In deciding whether to impose Rule 11 sanctions, a district court must apply an objective standard; it must determine whether a reasonable and competent attorney would believe in the merit of an argument." *Dodd Ins. Servs., Inc. v. Royal Ins. Co. of Am.*, 935 F.2d 1152, 1155 (10th Cir. 1991). From what I have seen I am satisfied that a reasonable and competent attorney could conclude that certain defendants acted in bad faith, thus creating unnecessary expenses for plaintiffs. Put another way, plaintiffs could and believe in the merits of their argument even though they have not pled sufficient evidence of bad faith to meet a clear and convincing evidence standard.

## ORDER

(1) Defendants' motions to dismiss, ECF Nos. 46, 78, 80, are GRANTED. Plaintiffs' cause of action is dismissed without prejudice on forum non conveniens grounds.

(2) Plaintiffs' motion for an order requiring payment of costs and service of process, ECF No. 86, is DENIED.

(3) As the prevailing parties, defendants are awarded costs to be taxed by the Clerk of Court pursuant to Fed. R. Civ. P. 54(d)(1) and D.C.COLO.LCivR 54.1.

DATED this 16th day of October, 2018.

BY THE COURT:

_____
R. Brooke Jackson
United States District Judge